## LOCAL 2787, AFSCME v. CITY OF MONTPELIER

[643 A.2d 838]

No. 92-338

November 3, 1993. The Vermont Labor Relations Board found that the City of Montpelier committed an unfair labor practice when it unilaterally changed the payment of police officers from weekly to biweekly, over the objection of the union that represents the officers. The change was made on April 4, 1991, during the effective term of the 1989–91 labor contract. The Board declined, however, to find an unfair labor practice for the ensuing contract years because the union refused to participate in bargaining over the payment period issue, despite repeated requests from the city to do so. It dismissed the union's petition because

no appropriate affirmative remedy could be made for the limited violation it found. The union appeals the Board's conclusion that no violation occurred after June 30, 1991, the expiration date of the contract between the union and the city, and the Board's failure to award a remedy. The city appeals the decision that it committed an unfair labor practice for the contract ending June 30, 1991.

The conversion from weekly to biweekly payment of wages was first announced to employees in January of 1990, but as a result of complaints by employees and the unions representing public works and fire department employees, implementation was delayed until February of 1991 and modifications were made in the plan. Although not formally notified, the police union was aware of the change and never indicated any objection to it. Bargaining for a contract to commence on July 1, 1991 began in 1990, and the parties agreed to a ground rule prohibiting new proposals after December 20, 1990. When the city attempted to implement the new payment policy in February 1991, the police union put forth its initial objection, claiming the change was not allowed by the existing labor contract. Despite numerous requests by the city, the union refused to bargain over the policy, claiming that it represented a new proposal that could no longer be raised because of the ground rule cutoff date. The city's decision to unilaterally implement the new payment policy led to this unfair labor practice charge.

The Board agreed that the city could not unilaterally implement the new payment policy because it was a mandatory subject of bargaining. It concluded, however, that the city had not waived its right to have the matter bargained by adoption of the ground rule, as the union had long been aware of the new policy and had failed to object in a timely fashion.

In general, we defer to the Board in determinations within its expertise. See *Vermont State Employees' Ass'n v. State*, 151 Vt. 492, 493, 562 A.2d 1054, 1055 (1989). The Board's conclusions must be upheld if supported by its findings. See *In re AFSCME, Local 490*, 153 Vt. 318, 321, 571 A.2d 63, 65 (1989).

The central point of the union's appeal is that the Board erred in not enforcing the city's waiver of its right to bargain the payment policy when it failed to raise it prior to December 20, 1990 as required by the ground rule. Although a party can contractually waive its statutory right to have an issue bargained, we will not lightly find a waiver. Contractual waivers are given "such effect as the negotiating history and other surrounding circumstances seem to make appropriate." *Radioear Corp.*, 214 N.L.R.B. 362, 364 (1974); see also *Aeronca, Inc.*, 253 N.L.R.B. 261, 264 (1980) (contractual waiver of right to have issue bargained effective only on "showing of a clear relinquishment of the right which is to be decided on the facts and circumstances surrounding the making of the contract as well as the language of the contract itself"), *enforcement denied on other grounds*, 650 F.2d 501 (4th Cir. 1981). The expectations caused by the actions of the opposing party are relevant to whether there has been a contractual waiver. See *AMCAR Div., ACF Indus., Inc. v. NLRB*, 592 F.2d 422, 429 (8th Cir. 1979); *Southern Materials Co.*, 198 N.L.R.B. 257, 258 (1972).

In light of all the surrounding circumstances, the union's silence for almost a year created a justifiable expectation in the city that it could implement the new payment policy without bargaining and without challenge, and thus its failure to raise the issue in bargaining prior to December 20, 1990 was excusable. In exercising its discretion to conclude that

it was inappropriate to enforce a waiver against the city under the circumstances, the Board acted consistent with earlier decisions. See *Local 98, Int'l Union of Operating Eng'rs v. Town of Rockingham,* 7 V.L.R.B. 363, 375 (1984) (waiver of bargaining rights must be conscious and explicit). The union's refusal to bargain the payment issue was unjustified and prevented a finding that the city committed an unfair labor practice with respect to the 1991 contract.[*]

We will not address the city's cross-appeal of the ruling that it committed an unfair labor practice by unilaterally implementing the payment policy prior to July 1, 1991. The contract then in force has long expired, and the Board ordered no remedy for the violation. The issue is moot.

*Affirmed.*

**Johnson, J.,** dissenting. Because I cannot agree with the majority's inequitable application of the law of waiver, I must respectfully dissent. I find it both unjust and confounding that, on the one hand, the city has preserved its right to bargain despite having committed three separate violations of the collective bargaining agreement; while, on the other hand, the union has waived its right to bargain solely because it insisted that the agreement be enforced.

---

[*] The dissent casts the issue as one of union, not city, waiver. It is understood that the union refused to bargain the pay period issue for the 1991–93 contract, and this refusal represents the only union "waiver" found by the Board. Neither this Court nor the Board found that the union waived rights by silence, nor do we believe that the question of a union waiver, apart from its refusal to bargain, is relevant to the decision in this case.

The majority today affirms the decision of the Vermont Labor Relations Board, which allowed the City of Montpelier unilaterally to implement a payroll conversion in its 1991–93 collective bargaining agreement with the city police union without first bargaining over the issue with the union. The Board's decision rests upon three conclusions: (1) that a January 24, 1990 memorandum from the city to all its employees was sufficient legal notice to require the police union to act to preserve its rights; (2) that, because of this memorandum, the police union was "aware for almost a year" of the city's intention to convert its payroll from a weekly to a biweekly basis, and so the city's failure to submit its conversion proposal before the December 20, 1990 proposal deadline was "excusable"; and (3) that the police union, by refusing to negotiate when the city finally did submit its proposal on January 30, 1991, "waived its rights to bargain the issue and created a situation where the City then acted within its rights to make the unilateral change upon the effective date of the successor agreement."

The Board, apparently aware that its conclusions rested on a shaky legal foundation, justified its result on the grounds that holding the city to the terms of its agreed upon deadline "inappropriately elevates form over substance under the circumstances of this case" and "would be contrary to good labor relations [ ] and reasoned judgment."

I am mindful of the long-settled principle that this Court grants substantial deference to the factual and legal determinations of the Vermont Labor Relations Board. *International Ass'n of Fire-Fighters v. Town of Hartford,* 146 Vt. 371, 374 503 A.2d 1143, 1145 (1985) (factual determinations); *In re Vermont State Colleges*

*Faculty Fed'n*, 138 Vt. 299, 301, 415 A.2d 226, 227 (1980) (legal determinations). This Court will reverse Board decisions, however, if they are not supported by the evidence, see, e.g., *Vermont State Colleges Faculty Fed'n v. Vermont States Colleges*, 152 Vt. 343, 566 A.2d 955 (1989), or if the statutory analysis does not withstand the Court's review. See, e.g., *Vermont State Employees' Ass'n v. State*, 151 Vt. 492, 562 A.2d 1054 (1989). Because I believe that neither the evidence nor the law supports the Board's findings, I would reverse the decision of the Board.

I do not agree that the city's January 24, 1990 memorandum to its employees was sufficient legal notice to require the police union to act to preserve its rights. Neither the Board nor the majority offers any basis in law for this conclusion. Indeed, both the 1989–91 collective bargaining agreement and the Vermont Municipal Employee Relations Act (VMERA), 21 V.S.A. §§ 1721–1735, contradict this conclusion. Article I, Section 2 of the agreement expressly provides that "[t]he City through its Manager . . . will not negotiate with nor make individual agreements with employees or groups of employees covered by this Agreement except with the express prior consent of the Union." This provision is in accord with VMERA, which forbids direct dealings between a municipal employer and employees represented by a union. 21 V.S.A. § 1726(a)(5). The city thus acted in violation of its collective bargaining agreement when it presented its conversion "proposal" directly to city employees without first contacting the police union. Nonetheless, both the Board and today's majority conclude that the police union's failure to object "in a timely fashion" to this "proposal" constitutes a waiver by the police

union of the right to bargain over that proposal.

Since the January 24, 1990 memorandum did not provide sufficient notice to the police union, the majority's conclusion that the union "failed to object in a timely fashion" makes no sense. At what point did the clock start to run? How long after that point did the police union have to raise a "timely" objection? The only logical answer is that the majority must believe that the police union should have raised its objection on or before December 20, 1990, the agreed upon deadline for submitting new proposals to be included in the 1991–93 collective bargaining agreement. But if this is so, then the majority punishes the police union for failing to object to a proposal that the city had failed to submit.

It is clear that the Board viewed the passing of the December 20 deadline not as the city's failure, but as the police union's failure:

> At the time of the December 20 submission of· proposals deadline, the Union had not approached the City regarding its objection to the conversion to the biweekly system . . . .

The majority appears to agree with this conclusion, holding that:

> In light of all the surrounding circumstances, the union's silence for almost a year created a justifiable expectation in the city that it could implement the new payment policy without bargaining and without challenge, and thus its failure to raise the issue in bargaining prior to December 20, 1990 was excusable.

I believe this conclusion is insupportable as a matter of law, public policy, and fundamental fairness. Contrary to the majority, I would hold that, as between parties to a col-

lective bargaining agreement, the party wishing to change the terms of the agreement should bear the higher duty to make known its intentions to the other party. Where the party seeking change is silent, I would hold that there then arises a "justifiable expectation" that the terms and conditions of employment will *not* change. See *Burlington Firefighters Ass'n, Local 3044, Int'l Ass'n of Firefighters v. City of Burlington*, 10 V.L.R.B. 53, 63 (1987) (labor union was not obligated to "respond in any manner" when city attempted to change policy during term of collective bargaining agreement, but rather "was entitled to rely upon the . . . provisions of the Contract which were essentially 'locked in' during the Contract term").

Such a holding would also comport with the terms of the 1989–91 collective bargaining agreement between these parties, which clearly states, in Article XXV, Section 4:

> Should neither party send a timely notice to modify or terminate this Agreement . . ., this Agreement shall be considered to have been automatically renewed . . . .

This Court has not yet addressed whether a party seeking to change the prevailing working conditions should have a higher burden to give actual notice to the other party. Recently, however, a Minnesota court had occasion to consider this question under facts substantially similar to those at bar. In *Law Enforcement Labor Services, Inc. v. City of Luverne*, 463 N.W.2d 546 (Minn. Ct. App. 1990), the Minnesota appeals court held that a police union did not waive its right to bargain over a change in employment conditions where the city announced the change in a single memorandum to all city employees, and where the police union did not express its intention to waive in clear and unmistakable language. *Id.* at 550.

The Minnesota court reasoned that a municipality claiming that a union waived its statutory right to bargain over a condition of employment must meet a two-part test: first, it must show that "the employer gave both adequate and timely notice of its intended action," and, second, it must show that the union "express[ed] its intention to waive in 'clear and unmistakable language' [citation omitted]." *Id.*; see also *School Comm. of Newton v. Labor Relations Comm'n*, 447 N.E.2d 1201, 1210 (Mass. 1983) ("A party may show that the other party clearly and unmistakably waived its right to bargain over an unlawful unilateral change where the other party had actual notice of the proposed change, a reasonable opportunity to negotiate over it, and unreasonably or inexplicably failed to bargain or to request bargaining.").

In the instant action, the Vermont Labor Relations Board found that:

> At no time during 1990 did any representatives of the Union approach [the city manager] . . . to express objections or concerns regarding the announced biweekly payroll conversion. At no time during 1990 did [the city manager] communicate with Union representatives directly concerning the payroll conversion. [The city manager] assumed that the Union had no objections to the conversion that was scheduled for February 1, 1991.

From this finding of fact, it is clear, first, that the police union, by its silence on and before December 20, 1990, did not waive its right to bar-

gain in "clear and unmistakable language," and second, that the city, by its silence, did not give "adequate and timely notice of its intended action" to the police union. I believe in circumstances such as this that the Minnesota decision provides guidance as to the proper allocation of equities. I would hold the city accountable for the failure to make its intentions clear to the police union.

Finally, I do not believe, given the city's two violations of the collective bargaining agreement just reviewed, and the third violation found by the Board for unlawfully implementing a unilateral change in conditions under the 1989–91 agreement, that the police union can rightly be said to have "waived its right to bargain over the issue" of payroll conversion by insisting that the city could not raise the issue on January 30, 1991, six weeks after the proposal deadline had passed.

The majority devotes a significant portion of its discussion to the legal standard required for a finding of waiver in a labor negotiation context. The majority, however, applies its analysis only to the claim that the city, by failing to meet the December 20 deadline, waived its right to bargain over the payroll conversion issue. Having found no waiver on the part of the city, the majority then agrees, without analysis, that the police union, by refusing to negotiate over the city's January 30 proposal, waived its right to bargain over the issue.

I agree with the majority's legal standard for waiver, that as a general rule, a waiver of statutory rights must be both conscious and explicit. But I am at great pains to see how the majority, if it were to apply this standard to the police union's conduct, could conclude that the police union consciously and explicitly waived its right to bargain the payroll conversion issue. The facts could

not be clearer: the police union never intended to *waive* its right to bargain, but at all times sought to *preserve* its right *not* to bargain.

Today's decision leaves municipal labor unions between the proverbial rock and a hard place when faced with a potential change in employment conditions, as defined in 21 V.S.A. § 1722(17), for which the city has given no actual notice. Prior to a contracted deadline for new proposals, it can object to a proposal the city has not officially put forward, and thereby preserve the city's right to include the proposal in the upcoming negotiations. Otherwise, once the deadline has passed, the union faces the untenable dilemma either to waive the contracted deadline and agree to bargain over the late proposal, thereby draining the contracted deadline of any value, or else to honor the contracted deadline and refuse to bargain over the late proposal, thereby waiving its right to bargain altogether. In any event, the union loses the benefit of the mutually agreed upon deadline for new proposals, which supposedly allows either party to exclude from negotiations matters not properly raised before the deadline.

The majority today tilts the balance of municipal labor negotiations unfairly in favor the municipality. Henceforth, a municipality can simply play a "waiting game" in its labor negotiations, in which a failure by both parties to discuss a substantive change before a contracted deadline permits the municipality to implement the change without pressure of bargaining or fear of challenge. As the majority correctly notes, this decision will not affect the Agreement or the Successor Agreement at issue here, since they have both expired by their terms. But I foresee a difficult period ahead, as municipalities and unions, long accustomed to stability

in their bargaining relations, sort out the implications of today's decision.