## Milton Education and Support Association v. Milton Board of School Trustees

[759 A.2d 479]

No. 97-218

Present: **Amestoy, C.J., Morse, Johnson and Skoglund, JJ.**

Opinion Filed July 14, 2000

*Joel D. Cook*, Montpelier, for Plaintiff-Appellee.

*Christopher D. Roy* and *Dennis W. Wells* of *Downs Rachlin & Martin PLLC*, Burlington, for Defendant-Appellant.

**Skoglund, J.** This case involves the obligation of parties to a collective-bargaining agreement to exhaust available contractual remedies before a statutory unfair-labor-practice charge will lie under the Vermont Municipal Relations Act. The Milton Board of School Trustees (school board) appeals from a decision of the Vermont Labor Relations Board (Labor Board), which held that the school board violated 21 V.S.A. § 1726(a)(5) by failing to bargain in good faith with the Milton Education and Support Association (association) over the decision to lay off bargaining-unit employees and to subcontract for custodial services. On appeal, the school board claims that, because the scope of its management rights under the collective-bargaining agreement is a question of contract interpretation, the Labor Board erred by refusing to defer to the arbitration process provided for in the collective-bargaining agreement. Further, the school board claims that the Labor Board erred in concluding that the association did not waive its right to bargain over the subcontracting decision. We agree with the school board's first argument; however, we disagree with its second argument. Therefore, we affirm in part, reverse in part and remand for the Labor Board to reconsider its decision in light of the result of the parties' arbitration.

I.

The association is the exclusive bargaining representative for the teachers and support personnel, including custodial staff, employed in the Milton Town School District. The parties, pursuant to 21 V.S.A. § 1725, have engaged in collective bargaining periodically over the

years and have entered into several successive collective-bargaining agreements for nonteacher employees. A brief review of the parties' negotiation history and prior bargained agreements is helpful to this discussion.

Article III of the parties' 1992-94 collective-bargaining agreement contained the following language enumerating management rights:

> It is herein agreed that except as specifically and directly modified by the express language in a specific provision of this Agreement, the Board retains all rights and powers that it has, or may hereafter be granted by law, and may exercise such powers at its discretion.

The parties continued to be governed by the 1992-94 agreement into 1995 while they negotiated a successor agreement.

In the spring of 1995, the school board openly considered, and decided against, subcontracting the school district's custodial and maintenance services to a nonbargaining-unit provider. Consequently, the association was aware of the school board's consideration of subcontracting at the time it commenced negotiations for a successor agreement.

During negotiations for the 1994-96 agreement, the association acceded to a change in Article III of the agreement, replacing the more general language with a provision offered by the school board listing "management rights" in greater detail. Article III then read in pertinent part as follows:

> 3.1 Management rights shall include, but not be limited to the right
> a. to hire, discharge, discipline, lay off, recall, transfer, promote and demote employees,
> b. to assign work and require overtime,
> c. to organize, enlarge, reduce or discontinue a function, position or department,
> d. to introduce new technology, tools, equipment or labor-saving devices,
> e. to establish new jobs,
> f. to classify and reclassify employees,
> g. to determine or change shifts, starting and quitting times and the number of hours and days worked,
> h. to evaluate employees,
> i. to promulgate rules and regulations which do not otherwise contravene the terms of this Agreement,

 j. to determine the manner, means and methods by which all operations and all educational missions and goals of the School District will be carried out,

 k. to take such other action as it deems necessary to maintain the efficiency of the District's operations.

The association and the school board executed the 1994-96 agreement on August 31, 1995.

After executing the 1994-96 agreement, due to expire June 30, 1996, the parties began negotiations for a successor agreement. In its first proposal for contract changes, the association requested a "protective clause re subcontracting of various services." At the request of the school board for more specific language, the association submitted two proposals that would have prohibited the school board from subcontracting any bargaining-unit work. One proposal provided: "The duties of any bargaining unit member or the responsibilities of any position in the bargaining unit shall not be altered, increased, or transferred to persons not covered by this Agreement." The other proposal provided: "The Board shall not employ persons or services to perform work regularly and customarily performed by bargaining unit personnel except for major projects and emergencies." The school board rejected both provisions. In December 1995, the parties ratified an agreement covering the period July 1, 1996, to June 30, 1999, and the agreement was signed by the parties on April 4, 1996. The provisions of Article III of the 1994-96 agreement were carried forward unchanged to the 1996-99 agreement.

On February 19, 1996, the school district superintendent sent the president of the association a memorandum stating that the school district business manager was considering contracting out custodial services for July 1, 1996, to June 30, 1997, to save costs and improve services. The president of the association wrote to the school board on March 28, 1996, requesting "to negotiate over the impact of the implementation of the sub-contracting for custodial services." The school board agreed to negotiate over the impact, and the parties met on April 17. As no decision to subcontract had yet been made, the issue was discussed only in general terms.

On May 2, 1996, the school board voted to authorize the business manager to execute a contract with a maintenance company for custodial services from July 1, 1996, to June 30, 1997. On May 9, 1996, the association filed a grievance alleging that the school board violated the collective-bargaining agreement by contracting out the custodial work. This grievance proceeded to arbitration under the

agreement.[1] On June 12, 1996, the association president wrote the superintendent and, for the first time, requested negotiation over the decision to subcontract itself, not just the impact thereof. This letter was followed by one, dated June 27, 1996, from the Vermont-NEA UniServ District #1 Director, informing the superintendent of the association's intention to file an unfair-labor-practice charge as a result of the subcontracting decision. On July 1, 1996, the subcontracted services began. In a letter dated July 12, 1996, the superintendent responded to the association's representative that the school board would not rescind its decision to subcontract and remained ready to further negotiate the impact of the decision to subcontract.

On July 19, 1996, the association filed a charge of unfair labor practices with the Labor Board, alleging that the school board unilaterally decided to contract out custodial services during the term of a collective-bargaining agreement under which custodial services is bargaining-unit work, in violation of 21 V.S.A. § 1726(a)(5). The school board moved for summary judgment before the Labor Board, arguing that the Labor Board should defer to the grievance procedure of the agreement, and that the association's delay of several months before requesting decisional bargaining constituted a waiver of any such bargaining right in light of the prior request for impact bargaining only. The association did not file an opposition to the motion.[2]

---

[1] Article VI, entitled "Grievance Procedure," provides:

 6.1 *Definitions*

 > a. Any claim by the Association . . . that there has been a violation, misinterpretation, or misapplication of the terms of this Agreement, or a violation of its . . . rights to fair treatment shall be a grievance.

 . . . .

 6.4 *Procedure*

 . . . .

 *Step 4 — Arbitration* — If the Association is not satisfied with the disposition of the grievance at Step 3, . . . then the Association may submit the grievance to final and binding arbitration under the voluntary Labor Arbitration Rules of the American Arbitration Association.

[2] The Labor Board hearings were held on February 27 and March 27, 1997. On June 6, 1997, the Labor Board issued its findings of fact, opinion and order. In June 1997, the school board filed a notice of appeal and a motion for stay pending appeal with the Labor Board. The Labor Board denied the stay and proceeded to the remedy portion of the case. In the meantime, the grievance had proceeded to arbitration, as noted. The arbitration was held, with a merits hearing conducted on April 29, 1997. On September

In a decision issued June 6, 1997, the Labor Board denied the school board's summary judgment motion and further ruled that it would not defer the dispute to the arbitration procedure because: (1) the issue of subcontracting is central to the association's ability to protect the bargaining-unit employees; (2) 21 V.S.A. § 1726(a)(5) mandates good-faith bargaining prior to subcontracting work that is done by bargaining-unit employees; and (3) the agreement does not explicitly grant the school board the right to subcontract work without negotiating with the association, and absent such an explicit provision, deferral of the dispute to arbitration is not appropriate. The Labor Board also held that the association did not waive its right to bargain over the subcontracting decision by failing to request bargaining until four months after it was notified that the school board was considering the issue. The Labor Board concluded that the school board committed an unfair practice by unilaterally subcontracting bargaining-unit work during a period when it had a legal duty to bargain in good faith. The school board appeals.

■■■■■ Our review of decisions of the Labor Board is limited. See *In re Butler*, 166 Vt. 423, 425, 697 A.2d 659, 661 (1997). We give substantial deference to the Labor Board, see *id.*, and presume its actions are correct and reasonable. See *In re Towle*, 164 Vt. 145, 148, 665 A.2d 55, 58 (1995). We will uphold the Labor Board's order if the findings, taken as a whole, justify its ultimate conclusion, see *In re West*, 165 Vt. 445, 449, 685 A.2d 1099, 1102 (1996), even if we would not have reached the same decision. See *Butler*, 166 Vt. at 425, 697 A.2d at 661. Nevertheless, this Court will reverse Labor Board decisions if they are not supported by the evidence, see *Vermont State Colleges Faculty Fed'n v. Vermont State Colleges*, 152 Vt. 343, 348, 566 A.2d 955, 958 (1989), or if the statutory analysis does not withstand the Court's review. See *Vermont State Employees' Ass'n v. State*, 151 Vt. 492, 495-96, 562 A.2d 1054, 1056-57 (1989).

---

3, 1997, the arbitrator issued his opinion and award. On September 11, 1997, the Labor Board held a hearing to consider the remedy portion of the case. On November 19, 1997, the Labor Board issued its final order. The Labor Board subsequently granted the school board's outstanding motion for stay pending appeal. Because the Labor Board refused to defer to arbitration, the results of the arbitration were never before the Labor Board for consideration. The arbitrator's opinion and award was submitted with the school board's brief in this appeal without objection from the association. We do not consider the arbitrator's opinion and award other than to note its existence.

## II.

■ The issue presented in this case is whether the Labor Board erred by refusing to defer to the arbitration process. Parties to a collective-bargaining agreement are required to exhaust contractual remedies before bringing a statutory unfair-labor-practice charge. See *Burlington Area Pub. Employees Union v. Champlain Water Dist.*, 156 Vt. 516, 518, 594 A.2d 421, 422-23 (1991). Thus, the Labor Board should defer to the grievance procedure in the agreement if the issue in the complaint is covered by the agreement, regardless of whether the issue might also involve an unfair-labor-practice claim. See *id.* at 519, 594 A.2d at 423. We require the parties to resolve their disputes under their agreement to foster the collective-bargaining relationship and to show our favor for voluntary arbitration. See *id.* at 519-20, 594 A.2d at 423. Nonetheless, the exhaustion doctrine does not bind the parties if the issue "does not qualify as a matter of contract interpretation, if an overriding statute negates deferral, or if the Board's own deferral guidelines indicate that deferral would not serve the purposes of the statute." *Id.* at 520, 594 A.2d at 423.

The issue here is not whether subcontracting is a mandatory subject of collective bargaining. See *Fibreboard Paper Prod. Corp. v. NLRB*, 379 U.S. 203, 210, 215 (1964) (under facts of case, decision to subcontract is subject of mandatory collective bargaining within statutory phrase "terms and conditions of employment" found in § 8(d) of National Labor Relations Act); *Middlebury Union High Sch. Educ. Support Personnel Unit v. Middlebury Union High Sch. Bd. of Sch. Dirs.*, 15 V.L.R.B. 397, 408-09 (1992) (construing statutory phrase "conditions of employment" as in *Fibreboard*, and holding that contracting out custodial work was mandatory subject of bargaining). Both parties agree that, under the facts of this case, it is. Rather, the question presented in the original grievance and in the subsequent Labor Board proceedings is whether the agreement contains bargained-for managerial rights that include the ability to subcontract bargaining-unit work.

The management-rights provision before us provides that the school board has the right, among others: (1) to hire, discharge, discipline, lay off, recall, transfer, promote and demote employees; (2) to reduce or discontinue a function or position; (3) to determine the manner by which all operations of the school district will be carried out; and (4) "to take such other action as it deems necessary to maintain the efficiency of the District's operations." The school board maintains that this provision covers the issue of subcontracting and

grants it the authority to decide how the school district's maintenance operation will be carried out, and to discontinue a function or position and subcontract the duties and responsibilities of such function or position if the efficiency of the school district's operations so requires.

The association, at least initially, gave credence to the school board's belief that the agreement authorized management to subcontract the maintenance work, as it responded to the decision to subcontract by requesting bargaining over the impact of such subcontracting, and not the subcontracting decision itself. Further, the association may be said to have tacitly conceded this was a contractual issue by filing a grievance over the subcontracting decision alleging a violation of the terms of the agreement.

In one sentence, the Labor Board dismissed the school board's claim that subcontracting was covered by the agreement, with no analysis of the management-rights section of the agreement. It held that the management-rights article of the agreement provided no basis for deferral, as it did not "explicitly refer to management's ability to subcontract work."

The Labor Board further did not believe that the parties' negotiating history supported the school board's claim, notwithstanding the fact that subcontracting was the subject of contract talks.[3] As noted above, the association had attempted to include "a protective clause re subcontracting" in the 1996-99 contract that would have specifically eliminated any ability of management to subcontract, but abandoned the effort short of impasse. Why the association did not insist on inclusion of a protective clause to the point of impasse is not revealed in the record. It certainly had the right to take its demand to impasse. See *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 674-75 (1981).[4] The actions of the association during negotiations would

---

[3]The Labor Board held that "the School Board should have indicated during negotiations for the 1996-99 collective-bargaining agreement that consideration was being given to subcontracting custodial services. Instead, the school board was silent on this issue during negotiations and waited until a few months after the agreement was ratified to announce it was considering subcontracting custodial and maintenance services." The Labor Board, however, made no finding that, indeed, the school board was considering subcontracting during the negotiations. Rather, the Labor Board found that, on February 1, 1996, the school board approved a proposal made by the school district business manager to revise job descriptions for maintenance and custodial personnel, the proposal that regenerated consideration of subcontracting those services. The agreement was ratified in December of 1995.

[4]The association's negotiator, a ten-year veteran of the process, testified that when the association withdrew its request for the protective clause, he was aware that the legal and arbitration precedent on subcontracting varied throughout the state and the

support a conclusion that the issue presented in this case requires an interpretation of the management-rights provision of the agreement.

The management rights spelled out in the provisions of Article III and the contract as a whole must be evaluated to determine whether those provisions allow the school board to subcontract the duties and responsibilities of the custodial function. The question of whether the contract provisions govern the specific action taken by management is properly deferred to grievance arbitration, particularly where, as here, the matter has already been the subject of negotiations.

Furthermore, no exception to deferral applies here. First, in this case, there is no overriding statute that negates deferral. Many grievances under a collective-bargaining agreement could also be construed as statutory violations. As we have previously stated: "If the deferral were limited to cases where grievances implicated no possible statutory violation, deferral would be rare indeed." *Champlain Water Dist.*, 156 Vt. at 521, 594 A.2d at 424. As noted earlier, both parties agree that subcontracting is a "condition of employment" and subject to collective bargaining pursuant to statute. The question is, was it a bargained-for element of management rights. Thus, in the instant case, contract interpretation may resolve the dispute, and the Labor Board should have deferred to the arbitration procedure. "It is merely the prudent exercise of restraint, a postponement of the use of the Board's processes to give the parties' own dispute resolution machinery a chance to succeed." *In re United Technologies Corp.*, 268 N.L.R.B. 557, 560 (1984).

Second, the Labor Board's guidelines on deferral policy, announced in *Burlington Educ. Ass'n v. Burlington Bd. of School Comm'rs*, 1 V.L.R.B. 335, 343-44 (1978), require a conclusion that deferral in this matter would not be adverse to the purposes of the Municipal Relations Act. See *Champlain Water Dist.*, 156 Vt. at 523, 594 A.2d at 425. In determining whether to require exhaustion of contractual remedies, the Labor Board considers whether the employer's action is intended to significantly undermine, or would have the effect of significantly undermining, the union, and whether the employees have adequate redress through the grievance procedure. The Labor Board may also examine "the nature of the alleged unfair practice and its effect on the union and its members," and consider whether the

---

nation. He had determined that school boards had been allowed in some instances to subcontract bargaining-unit duties, even in the absence of contract language specifically authorizing them to do so. He testified that "inconsistency seemed to be the most consistent element behind subcontracting."

employer's conduct would have an unduly chilling effect on the union or union representation. See *Burlington Educ. Ass'n*, 1 V.L.R.B. at 343-44.

These guidelines do not negate deferral in this case. There is no basis in the record to conclude that the employer's action was intended to, or did, undermine the association or its ability to bargain on behalf of its members. There is no dispute that the school board was required to bargain over the "impact" of its decision to contract out the custodial services. And, when the association requested a bargaining session over the impact of the subcontracting decision, one was held. The association brought a grievance that was promptly referred to arbitration for resolution. Adequate redress was available through the grievance procedure.[5] The record does not support a finding that the actions of the school board, taken with full notification to the association, in any meaningful way "chilled" the association's ability to represent its members.

Both federal and state law have long recognized the importance of arbitration in resolving labor disputes, based on the underlying conviction "that the parties to a collective-bargaining agreement are in the best position to resolve, with the help of a neutral third party if necessary, disputes concerning the correct interpretation of their contract." *United Technologies Corp.*, 268 N.L.R.B. at 558. In deferring to arbitration, the National Labor Relations Board has opined that it would discourage the collective-bargaining procedure for it to "assume the role of policing collective contracts between employers and labor organizations." *Id.* By allowing a dispute to go to arbitration, "its fragmentation is avoided to a substantial extent; and those conciliatory measures which Congress deemed vital to 'industrial peace' and which may be dispositive of the entire dispute, are encouraged." *Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 272 (1964) (citation omitted).

Here, the association and the school board have voluntarily elected to create dispute-resolution machinery culminating in final and binding arbitration. It is contrary to basic policy principles for the

---

[5] Following a merits hearing, the arbitrator found that the subcontract was, on balance, a reasonable exercise of inherent managerial rights and did not constitute a violation of the collective-bargaining agreement. He denied the grievance. He expressed no opinion on the question "of whether, as a prerequisite to exercising a reserved contract right, the Board should first have satisfied some statutory bargaining responsibility." While the dissent suggests that the grievance procedure "provide[d] no redress for the union," we disagree. 171 Vt. at 85-86, 759 A.2d at 494. The grievance procedure worked as it was intended; the association simply did not win the argument.

Labor Board to assume control of the disagreement prior to an honest attempt by the parties to resolve their disputes using that machinery.

■ We conclude that: (1) the question of whether the school board had the authority, under the management-rights section of the parties' contract, to subcontract bargaining-unit work, requires an interpretation of the contract; (2) deferral in this case is not contrary to the purposes of the collective-bargaining statute; and (3) deferral in this case is not contrary to the Labor Board's policy on deferral. Accordingly, the Labor Board erred in failing to defer to arbitration. To be clear, we do not decide the merits of the unfair-labor-practice claim. Rather, we remand to give the Labor Board the opportunity to reconsider its decision on the unfair-labor-practice claim in light of the result of the parties' arbitration.

### III.

The school board also claims that the Labor Board erred in denying the school board's motion for summary judgment. The school board argues that, because the association did not file an opposition to the motion, the Labor Board should have granted the motion.

In support of its argument, the school board relies on V.R.C.P. 56(e), which provides, in pertinent part, that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, *if appropriate*, shall be entered against the adverse party." (Emphasis added.) Further, the school board notes that, under V.R.C.P. 56(c)(2), "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." According to the school board, because the association filed no response, under V.R.C.P. 56(c)(2), the school board's factual allegations were deemed admitted, and thus, under V.R.C.P. 56(e), the Labor Board should have granted its motion for summary judgment.

■ The Labor Board, following a full evidentiary hearing on the merits, concluded that, accepting all the material facts alleged by the school board in its motion for summary judgment as true, the facts were insufficient to warrant a grant of summary judgment as a matter of law. Thus, the Labor Board determined that summary judgment was not appropriate. "[S]ummary judgment is appropriate only when the record clearly shows that there is no genuine issue of

material fact and that the movant is entitled to judgment as a matter of law." *Bacon v. Lascelles*, 165 Vt. 214, 218, 678 A.2d 902, 905 (1996). Having reviewed the pleadings and the motion for summary judgment in light of the fully developed record, we find no error.

## IV.

Finally, the school board claims that, even if the association were deemed to possess a right to request renewed bargaining over the subcontracting decision itself, it waived any such right by its conduct following notification of a potential subcontracting decision. The Labor Board found that, notwithstanding the association's four-month delay in requesting decisional bargaining after previously requesting only impact bargaining, the association did not waive its right to bargain over the subcontracting decision itself. Finding no waiver, the Labor Board held that the school board's unilateral decision to subcontract constituted an unfair labor practice.

However, because the Labor Board failed to defer to arbitration, on remand, it must reconsider its decision that an unfair labor practice occurred. The question of whether the actions of the association, from the time it was informed of the potential subcontracting of custodial services in February until it requested decisional bargaining on this issue in June, constituted a waiver of its bargaining rights is separate and distinct from the ultimate question of whether the school board committed an unfair labor practice. Therefore, to limit the issues on remand, we address the waiver issue.

A party can waive its statutory right to have an issue bargained; however, "we will not lightly find a waiver." *Local 2787, AFSCME v. City of Montpelier*, 161 Vt. 567, 568, 643 A.2d 838, 840 (1993) (mem.). See also *Local 98, Int'l Union of Operating Eng'rs v. Town of Rockingham*, 7 V.L.R.B. 363, 375 (1984) (waiver of bargaining rights must be conscious and explicit).

 Here, we conclude that the association's actions — seeking to bargain over only the impact of the decision, filing a grievance, and subsequently seeking decisional bargaining four months later — do not constitute a conscious-and-explicit waiver of a bargaining right. Nor was the delay of such duration as to suggest waiver. Therefore, we affirm the Labor Board's ruling that the association did not waive its right to bargain over the subcontracting decision.

*Affirmed in part, reversed in part and remanded for proceedings not inconsistent with this opinion.*

**Johnson, J.,** concurring and dissenting. For twenty years, Vermont law has consistently required a union's waiver of statutory bargaining rights to be "conscious and explicit." Relying on this precedent, the Vermont Labor Relations Board concluded that the union had not waived its statutory bargaining rights on subcontracting because the parties' collective-bargaining agreement does not consciously and explicitly waive this right. Today, the majority abandons the conscious-and-explicit-waiver rule and concludes that the collective-bargaining agreement, completely silent on subcontracting, presents an issue of contract interpretation, which the Labor Board is required to defer to arbitration. Thus, the majority remands this case to the Labor Board to reconsider its decision on the union's unfair-labor-practices charge in light of the arbitrator's decision. The arbitrator concluded, however, just as the Labor Board concluded, that the agreement did not authorize the school board to subcontract. Thus, the only issue on remand is the merits of the unfair-labor-practices charge, which the Labor Board has already resolved in the decision now before us. I would affirm the Labor Board decision. I therefore respectfully dissent.[1]

## I.

This case presents a straightforward statutory claim, easily resolved under Vermont precedent. The union claims that the school board committed an unfair labor practice by terminating union workers and subcontracting their work without bargaining in good faith with the union. See 21 V.S.A. § 1726 (unfair labor practices). Section 1725(a) of the Municipal Labor Relations Act requires an employer to bargain in good faith with a bargaining unit "with respect to wages, hours and conditions of employment." 21 V.S.A. § 1725(a). Section 1726(a)(5) states that it is an unfair labor practice to refuse to bargain in good faith with the exclusive bargaining agent. In construing similar language in the National Labor Relations Act, the United States Supreme Court concluded that subcontracting — replacing

---

[1] I dissent to section II of the majority's decision, concluding that the Labor Board erred in failing to defer to arbitration the question of whether the management-rights provision of the collective-bargaining agreement authorizes the school board to subcontract union jobs to nonunion workers. I also dissent to the majority's remand because the Labor Board has already decided the issue remanded. I concur with the holdings in section III — there was no error in denying summary judgment — and section IV — the union did not waive its statutory bargaining rights by initially requesting impact bargaining only, by filing a grievance or by its delay in requesting decisional bargaining.

union workers with those of an independent contractor to do the same work — is a mandatory subject of collective bargaining under the statute. See *Fibreboard Paper Prod. Corp. v. NLRB*, 379 U.S. 203, 209-10, 215 (1964). This rule was adopted by the Vermont Labor Relations Board in *Middlebury Union High Sch. Educ. Support Personnel Unit v. Middlebury Union High Sch. Bd. of Sch. Dirs.*, 15 V.L.R.B. 397, 408-09 (1992). The majority concedes that employees have a statutory right to good-faith bargaining on subcontracting. See 171 Vt. at 70, 759 A.2d at 483-84.

In Vermont, the parties to a collective-bargaining agreement are generally required to exhaust their contractual remedies, however, prior to bringing a statutory unfair-labor-practices charge. See *Burlington Area Pub. Employees Union v. Champlain Water Dist.*, 156 Vt. 516, 518, 594 A.2d 421, 422-23 (1991). Thus, we require the Labor Board to begin its analysis of an unfair-labor-practices charge by determining whether the complaint involves a contract issue subject to arbitration, regardless of whether it might also involve a statutory unfair-labor practice. See *id.* at 519, 594 A.2d at 423. The exhaustion doctrine promotes the collective-bargaining process by requiring the parties to resolve their disputes under the dispute-resolution procedures for which they bargained: the procedures in their written agreement. See *id.* at 519-20, 594 A.2d at 423. The doctrine does not apply, however, if (1) there is no issue of contract interpretation, (2) an overriding statute negates deferral, or (3) the Labor Board's deferral guidelines indicate deferral would not serve the purposes of the statute. See *id.* at 520, 594 A.2d at 423.

The Labor Board applied this rule. It decided not to defer this case to arbitration because (1) subcontracting is a mandatory subject of good-faith bargaining under the statute; (2) the issue of subcontracting is central to the union's ability to protect its members and thus central to the system of collective bargaining; (3) the Labor Board's mandate is to enforce the statutory system of collective bargaining, whereas the arbitrator looks to contract interpretation alone, (4) given the significance of subcontracting to the collective-bargaining relationship, it would not defer the issue to arbitration unless the agreement explicitly addressed subcontracting, and (5) the agreement does not explicitly address subcontracting, thus deferral is inappropriate. The Labor Board also rejected the school board's contention that the union waived the right to bargain on subcontracting because it delayed in requesting bargaining on the subcontracting decision. The Board concluded that the six week delay was not a

conscious and explicit waiver of statutory bargaining rights. Accordingly, the Labor Board ruled that the school board had committed an unfair labor practice by subcontracting union work and refusing to bargain in good faith over the decision. Giving "great deference" to a decision of the Labor Board, *In re VSEA*, 164 Vt. 214, 216, 666 A.2d 1182, 1183 (1995), particularly on a determination within its expertise, see *Local 2787, AFSCME v. City of Montpelier*, 161 Vt. 567, 568, 643 A.2d 838, 839 (1993) (mem.), I would affirm the decision.

## A. No Contract Issue

Applying the three-prong deferral test, it is apparent that deferral to arbitration is inappropriate in this case. First, this case should not be deferred to arbitration because there is no contract issue. There is no dispute that subcontracting is a statutory subject of bargaining under 21 V.S.A. § 1725(a). Vermont precedent clearly requires that a statutory right be consciously and explicitly waived. See, e.g., *Local 2787*, 161 Vt. at 568-69, 643 A.2d at 840 (citing with approval Labor Board rule that waiver of bargaining rights must be "conscious and explicit"); *Local 98, Int'l Union of Operating Eng'rs v. Town of Rockingham*, 7 V.L.R.B. 363, 375-76 (1984) (requiring town to show that union "consciously and explicitly" waived bargaining rights); *Vermont State Employees' Ass'n v. State*, 5 V.L.R.B. 303, 326 (1982) ("In determining whether a party has waived its bargaining rights, we have required that it be demonstrated a party consciously and explicitly waived its rights."); *Vermont State Employees' Ass'n v. State*, 2 V.L.R.B. 155, 160 (1979) (waiver of statutory duty to bargain in mandatory subjects "must be in clear and unmistakeable [sic] language").

Therefore, we must determine whether the parties' agreement consciously and explicitly waives the statutory right. Because the agreement is completely silent on subcontracting, it does not waive the union's statutory right. See also *Milton Bd. of Sch. Dir's v. Milton Staff Ass'n*, 163 Vt. 240, 244, 656 A.2d 993, 995 (1995) ("We will not supply terms or embrace a construction that would alter the rights of the parties as expressed in the original agreement."). Because there is no contract issue, there is no issue to arbitrate. This case is simply resolved by applying Vermont precedent.

The majority muddles the contract issue by confusing basic labor law concepts — "discontinuing a position" with "subcontracting a position." The management-rights provision of the parties' collective-bargaining agreement details specific rights reserved to the school

board. Subcontracting is not one of them. The majority infers that the language authorizing the school board to "discontinue a function or position" might be construed to authorize the school board to terminate union workers and subcontract the work. 171 Vt. at 71, 759 A.2d at 484. The terms "subcontracting" and "discontinuing a position" have distinct meanings, however, in labor law. Unlike subcontracting, a decision to discontinue a position and therefore terminate union workers is not even a statutory subject of bargaining. See *First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 686 (1981) (holding under parallel federal statute that terminating workers in connection with closing one site of business was not mandatory subject of bargaining). Thus, the majority's suggestion that the terms are interchangeable is wrong as a matter of law. The language authorizing the school board to discontinue a position does not authorize the school board to replace union workers with nonunion workers to do the same work.

The majority decision is perplexing. It considers three factors in reaching its decision: (1) the union gave credence to the school board's position by initially requesting bargaining on the impact of the subcontracting decision only, see 171 Vt. at 71, 759 A.2d at 484, (2) the union "tacitly conceded" that the school board's refusal to bargain was a contractual issue by filing a grievance alleging violation of the agreement, *id.*, and (3) when the school board rejected the union's proposed contract language prohibiting subcontracting, the union "abandoned the effort short of impasse." *Id.* The majority provides no explanation and cites no legal authority to support its theory that these three post-agreement actions of the union are relevant to its conclusion that interpretation of the management-rights clause of the parties' agreement may resolve this dispute, and thus, the Labor Board should have deferred this case to arbitration. See *id.* at 72, 759 A.2d at 484-85.

None of the three factors relied upon by the majority supports its position. First, I disagree that the union conceded anything by filing a grievance alleging violation of the agreement. Unions routinely file a grievance and an unfair-labor-practice claim on the basis of the same facts. In such cases, the Labor Board routinely defers to the arbitrator, while retaining jurisdiction for post-arbitral review. See, e.g., *Milton Educ. & Support Ass'n v. Milton Bd. of Sch. Dirs.*, 22 V.L.R.B. 330, 333-34 (1999) (concluding that dispute involves interpretation of collective-bargaining-agreement provision on teacher work loads, and thus, deferring to arbitration while retaining juris-

diction for post-arbitral review); *BED IBEW, Local 300, Unit Six v. Burlington Elec. Dep't*, 22 V.L.R.B. 325, 327-28 (1999) (concluding that dispute involves interpretation of collective-bargaining agreement by blending text with past practices, and thus, deferring to arbitration while retaining jurisdiction for post-arbitral ruling on unfair-labor-practice charge); *IBEW Local 300 v. Town of Ludlow*, 19 V.L.R.B. 250, 254-55 (1996) (concluding that dispute involves interpretation of collective-bargaining-agreement provision concerning holidays and past practices, and thus, deferring to arbitration while retaining jurisdiction for post-arbitral ruling on unfair-labor-practices charge); *Greenslet v. Town of Ludlow*, 19 V.L.R.B. 241, 244-45 (1996) (concluding that dispute involves interpretation of overtime provisions of collective-bargaining agreement, and thus, deferring to arbitration while retaining jurisdiction for post-arbitral review); *I.U.O.E. Local 98, AFL-CIO v. Windham Solid Waste Management Dist.*, 19 V.L.R.B. 236, 238-39 (1996) (concluding that dispute involves interpretation of seniority provisions of collective-bargaining agreement, and thus, deferring to arbitration prior to considering unfair-labor-practice claim); *AFSCME, Local 490, Bennington Dep't of Public Works & Police Units v. Town of Bennington*, 9 V.L.R.B. 195, 195 (1986) (concluding that dispute involves issue of contract interpretation and deferring to arbitration while retaining jurisdiction for post-arbitral review); *Burlington Educ. Ass'n v. Burlington Bd. of Sch. Comm'rs*, 1 V.L.R.B. 335, 345 (1978) (deferring to arbitration and declining to rule on unfair-labor-practice charge). The Labor Board defers to arbitration when there is an issue to arbitrate.

No Vermont case has ever held, as the majority does here, that filing a grievance "tacitly conceded" that the dispute was covered by the agreement. To the contrary, the Labor Board's decisions over the last twenty years indicate that the majority's position is a complete about-face in Vermont law. Filing in the wrong forum has never waived the right to bring the claim in the proper forum. Filing a grievance does not waive the right to bring an unfair-labor-practices charge. The majority's reliance on this factor deserves some explanation, but the majority provides none.

Further, the conduct of the parties after the agreement is ratified is simply not relevant to construction of the agreement or the deferral decision. And even if the post-agreement conduct were relevant to construction of the agreement, then it would be equally valid to conclude that the school board's action of providing notice to the union that it was considering subcontracting "tacitly conceded" that the school board knew that the subject was still open to bargaining.

Second, the majority rules that the union's initial request for impact bargaining only "gave credence to the school board's belief that the agreement authorized management to subcontract the maintenance work." 171 Vt. at 71, 759 A.2d at 484. Aside from the error in the union official's request, the union conducted a public campaign against subcontracting that clearly indicated that it objected. Moreover, the error was corrected after the union consulted with counsel. The Board concluded that this brief lapse did not excuse the school board from good-faith negotiations. Indeed, in part IV of its decision, the majority agrees with the Labor Board's decision in this respect. But, the majority does not explain how the union's error — in initially requesting only impact bargaining — is relevant in determining whether the management-rights provision, adopted months prior to this error, was intended by the parties to cover subcontracting. Again, this post-agreement action by the union is not relevant to whether the dispute is covered by the agreement or whether the dispute should be deferred to arbitration. The majority cites no authority to the contrary.

Finally, the majority relies on the negotiating history of the parties, the circumstances surrounding the making of the agreement, which I agree, may be relevant to the intent of the parties in forming an agreement. The negotiating history recited by the majority in this case, however, sheds no light whatsoever on whether the management-rights provision covers subcontracting. The provision was adopted verbatim from the parties' previous agreement, so the negotiating history does not help in determining the intent of the parties in accepting this language. The negotiating history does not indicate that the union waived bargaining on subcontracting at any time, say, for example, in exchange for some other benefit. If the negotiating history in this case shows anything, it is that the issue was left unresolved and open to bargaining. The point upon which the majority fixes is that the union did not pursue to impasse the provisions it proposed prohibiting subcontracting. It did not agree, however, to any provision authorizing subcontracting either. Both the agreement and the negotiating history recited show that the issue is unresolved and therefore still open to bargaining. The majority's decision to the contrary — that "[t]he actions of the association during negotiations would support a conclusion that the issue presented in this case requires an interpretation of the management-rights provision of the parties' agreement" — is unsupported by law or fact. *Id.* at 72, 759 A.2d at 484-85.

In sum, the majority relies solely on *the conduct of the union* to support its holding on deferral.[2] The conduct of the union is not, however, relevant to the decision of deferral under our three-prong deferral rule. The only issues relevant are: (1) whether there is an issue of contract interpretation, (2) whether there is an overriding statutory right, or (3) whether *the conduct of the employer* undermined the union or the collective-bargaining process. The majority's multi-factored analysis of *the union's conduct*, to determine that interpretation of the parties' agreement may resolve this dispute, is unprecedented.[3]

## B. Overriding Statutory Right

The second prong of the rule requires us to determine whether there is an overriding statutory right that negates deferral to arbitration. Here, the union's unfair-labor-practices claim is based on the school board's decision to subcontract without bargaining with the union. Subcontracting is not addressed in the parties' agreement;[4] thus, I would not defer the claim to arbitration, the procedure

---

[2] As the majority notes in section IV of its decision, the union may by its conduct waive statutory bargaining rights. Whether the union has waived its statutory bargaining rights by its conduct is properly decided by the Labor Board, not the arbitrator. The majority has affirmed the Labor Board's decision that the union's conduct did not consciously and explicitly waive the right to bargain on subcontracting.

[3] Not surprisingly, the majority does not cite a single decision to support its alternative multi-factored analysis of the union's conduct because courts in other jurisdictions have generally approved the National Labor Relations Board's rule, almost identical to Vermont's conscious-and-explicit-waiver rule, that a union's waiver of the statutory right to bargain must be clear, unmistakable and explicitly stated. See, e.g., *Uforma/ Shelby Business Forms, Inc. v. NLRB*, 111 F.3d 1284, 1289 (6th Cir. 1997) (union's waiver, in collective-bargaining agreement, of statutory right to bargain must be clear and unmistakable); *Capitol Steel & Iron Co. v. NLRB*, 89 F.3d 692, 697 (10th Cir. 1996) (same); *Furniture Rentors of America, Inc. v. NLRB*, 36 F.3d 1240, 1245 (3d Cir. 1994) (same); *Olivetti Office U.S.A., Inc. v. NLRB*, 926 F.2d 181, 187 (2d Cir. 1991) (same); see also *Gannett Rochester Newspapers v. NLRB*, 988 F.2d 198, 203 (D.C. Cir. 1993) (waiver of statutory right must be clear and unmistakable; general contractual provision does not waive statutory right unless explicitly stated; silence in agreement is insufficient to constitute waiver). Although the United States Supreme Court has not addressed the precise issue in this case, it has held that a union's waiver of other statutory rights must be clear, unmistakable and explicit. See, e.g., *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983) (contractual waiver of statutorily protected right against discrimination on the basis of union status must be "explicitly stated" and "clear and unmistakable").

[4] The so-called "zipper clause" of the parties' agreement — which provides that neither party is required to negotiate on any matter, whether or not covered by the agreement, during the term of the agreement — was not effective until July 1, 1996. The school board has not argued that the union waived its statutory bargaining rights by agreeing to the zipper clause.

established by the parties to resolve disputes that arise under their agreement. Because there is no contract right raised in this case, the statutory right is obviously overriding. There is no conflict with the exhaustion doctrine because the dispute is not covered by the contract.

## C. Board's Deferral Guidelines

Finally, the third prong of the deferral rule requires us to determine whether the Labor Board's deferral guidelines indicate that deferral would not serve the purposes of the statute. In determining whether to require the parties to exhaust their contractual remedies, the Labor Board considers "the nature of the alleged unfair labor practice," "whether the action of the employer is designed or would have the effect of significantly undermining the union," and whether the union has "an adequate redress for the alleged wrong through the grievance procedure." *Burlington Educ. Ass'n v. Burlington Bd. of Sch. Comm'rs*, 1 V.L.R.B. at 343. The majority concludes that "[t]here is no basis in the record to conclude that the employer's action was intended to, or did, undermine the association or its ability to bargain on behalf of its members," and that "[a]dequate redress was available through the grievance procedure." 171 Vt. at 73, 759 A.2d at 485. I disagree with both conclusions.

Here are the facts. During negotiations for the 1996-99 agreement, the union proposed two alternative provisions prohibiting subcontracting. The school board rejected both provisions but did not propose any alternative. Notably, it did not propose adding "subcontracting" to the management-rights clause, which details at great length the rights of the school board. The parties ratified the agreement by the end of December 1995. Before the parties signed the agreement, however, the superintendent notified the union that the business manager was considering subcontracting union jobs to nonunion workers for the period covered by the agreement the parties had just ratified.

On March 28, 1996, before consulting with counsel, the union requested "to negotiate over the impact of the implementation of sub-contracting for custodial services." On April 17, the parties met to discuss the impact of the subcontracting decision. Because the school board had not made a decision on subcontracting, however, the parties actually discussed the reasons the school board was considering subcontracting, rather than the impact of such a decision. Another meeting was scheduled, but for reasons not apparent in the

record, was never held. During this time, the union also organized public opposition to the proposed subcontracting. The campaign included letter writing and telephone calls to school board members, letters to the editor of the local newspaper, presenting a petition to the school board and speaking out against subcontracting at school board meetings. Thus, despite the request for impact bargaining only, it is inconceivable that the school board was not aware that the union objected to subcontracting and wanted to bargain the issue. Compare *Local 2787*, 161 Vt. at 568, 643 A.2d at 840 (union's silence for over a year about proposed change in working conditions created justifiable expectation in employer that it could implement new conditions without challenge) with *Mount Abraham Educ. Ass'n v. Mount Abraham Union High Sch. Bd. of Sch. Dirs.*, 4 V.L.R.B. 224, 231-32 (1981) (rejecting school board's contention that it had no obligation to bargain where association did not request bargaining because grievance filed by union "was a clear sign of its objection to the unilateral [decision of school board]").

On May 2, 1996, before the parties were able to continue their negotiations, the school board voted to subcontract the maintenance and custodial services for 1996-97. On May 9, the union filed a grievance pursuant to the collective-bargaining agreement. On June 6, after consulting with counsel, the union requested that the school board negotiate over the decision. The request was made only six weeks after the school board decided to subcontract and before the decision was implemented on July 1. On July 12, the school board responded that it would not rescind its decision to subcontract, and on July 19, the union filed an unfair-labor-practice claim.

I believe that the record fully supports the Labor Board's decision. The Labor Board recognized that the union was not without fault because initially it sought to bargain only on the impact of subcontracting, not on the subcontracting decision itself. Nonetheless, the Labor Board concluded that the brief lapse did not excuse the school board from failing to negotiate in good faith with the union. The school board was well aware of the union's opposition to subcontracting as a result of the April 17 meeting and the organized campaign against subcontracting. Nonetheless, without pursuing any further negotiations with the union, the school board unilaterally decided to subcontract and refused to negotiate over this decision when requested by the union six weeks later. The Labor Board concluded that the school board's refusal to engage in the collective-bargaining process was particularly disturbing because the issue of subcontract-

ing "goes to the heart of the union's ability to protect bargaining unit employees," and "involves an issue central to the system of collective bargaining." Further, it concluded that the actions of the school board were "seriously detrimental to good faith labor relations" because they "preclud[ed] meaningful negotiations." This Court should uphold the conclusions of the Labor Board because they have factual support. See *In re VSEA*, 164 Vt. at 216, 666 A.2d at 1183 (question on appeal is whether there is factual support for Board's conclusion).

It is difficult to understand how the majority concludes that there are no facts in the record to support the Labor Board's conclusion that the school board's refusal to bargain in good faith over the subcontracting decision undermined the union's ability to bargain on behalf of its members. See 171 Vt. at 73, 759 A.2d at 485. The record indicates that the school board negotiated an agreement with the union but, before the term of the agreement began, the school board fired nine union workers, replaced them with nonunion workers and refused to bargain with the union over the decision. What could undermine the union more than an employer replacing union workers with nonunion workers and refusing to negotiate over the decision? An employer's refusal to participate in good-faith bargaining on a mandatory subject of bargaining — particularly on the subject of subcontracting, which "goes to the heart of the union's ability to protect bargaining unit employees" — obviously undermines the union's ability to bargain on behalf of its members.

The majority also concludes that the union had adequate redress through the grievance procedure. The grievance procedure, however, is limited to resolving claims based on the agreement. Because the agreement does not address the issue of subcontracting, there is nothing in the contract for the arbitrator to interpret. Indeed, the arbitrator here concluded that subcontracting is not addressed by the collective-bargaining agreement. Because the parties' agreement provides that the grievance procedure applies only to disputes covered by the agreement, it is clear that the grievance procedure provides no redress for the union.

Applying our three-prong deferral rule in this case, the Court should affirm the decision of the Labor Board that deferral to arbitration is inappropriate in this case. Further, as the Labor Board held: "The collective bargaining agreement [is] silent on management's ability to contract out work. This silence does not equate with the School Board's ability to unilaterally contract out work without negotiating with the Association." See *Gannett Rochester Newspa-*

*pers v. NLRB*, 988 F.2d 198, 203 (D.C. Cir. 1993) (courts may not infer from general contractual provision that parties intended to waive statutorily protected right; silence in bargaining agreement is insufficient to meet clear-and-unmistakable-waiver standard); *AMCAR Division, ACF Indus., Inc. v. NLRB*, 592 F.2d 422, 429 (8th Cir.1979) (agreement with strong management-rights clause but silent on subcontracting does not authorize employer to subcontract union work without bargaining first with union). An employer's unilateral change in a mandatory subject of bargaining and refusal to bargain, absent an explicit waiver of the right by the union, is a per se violation of the union's statutory right to bargain the issue. See *Mount Abraham Educ. Ass'n*, 4 V.L.R.B. at 231-32.

## II.

The majority concludes that the Labor Board erred by failing to defer the dispute to arbitration, and thus it remands the case to the Board to reconsider its decision in light of the decision of the arbitrator, which was issued after the Labor Board's decision here on appeal. See 171 Vt. at 74, 759 A.2d at 486. The practical result of the majority's remand is simply to delay a final decision in this case.

For post-arbitral review, the Labor Board employs a five-part test. It will defer to the decision of the arbitrator provided that the following five criteria are met: "1) fair and regular arbitration proceedings; 2) agreement by all parties to be bound; 3) the decision is not repugnant to the purpose and policies of the Municipal Employee Relations Act; 4) *the arbitrator clearly decided the unfair labor practice issue*; and 5) the arbitrator decided issues within his or her competency." *Milton Educ. & Support Ass'n v. Milton Bd. of Sch. Dirs.*, 22 V.L.R.B. at 335 (emphasis added); see also *IBEW Local 300 v. Town of Ludlow*, 19 V.L.R.B. at 255 (same).

The arbitrator issued an opinion on the union's grievance on September 3, 1997, about three months after the Labor Board's decision. The parties stipulated to the following issue: "Did the District violate the 1996-1999 collective bargaining agreement when it subcontracted custodial services?" The arbitrator noted that the agreement did not explicitly authorize or prohibit subcontracting of bargaining-unit work. Concerning the management-rights provision, he stated: "When the parties negotiated the language of § 3 [the management-rights provision], the issue of subcontracting was never raised, so no firm conclusion can be drawn as to what was in the collective minds of the parties." As the agreement provided no basis

for resolving the parties' dispute, the arbitrator stepped beyond the language of the agreement to reach his decision. He did not rely on the past practices of the school board, which may become an implied part of the agreement. See *Champlain Water Dist.*, 156 Vt. at 525, 594 A.2d at 426 (Dooley, J., concurring). Nor did he rely on the circumstances surrounding the making of the agreement, which may help ascertain the parties' intention. See *John A. Russell Corp. v. Bohlig*, 170 Vt. 12, 17, 739 A.2d 1212, 1217 (1999). Rather, he decided that "subcontracting is an inherent managerial right." Thus, he held that the school board had not violated the collective-bargaining agreement by subcontracting the bargaining-unit work.

The determination that subcontracting is an inherent managerial right is a statutory construction of 21 V.S.A. § 1725(a), which is incorrect as a matter of Vermont law and properly an issue for the Labor Board, not the arbitrator who was limited by the agreement to resolving issues arising under an agreement. Inherent managerial rights are nonbargainable matters. See 21 V.S.A. § 1722(11) ("Managerial prerogative" means any nonbargainable matters of inherent managerial policy). Neither party is compelled to bargain over any issue of inherent managerial right. See 21 V.S.A. § 1725(a). The parties are required to bargain over "wages, hours and conditions of employment." *Id.* Both parties agree, and the majority acknowledges, that subcontracting falls within "wages, hours and conditions of employment," and thus is a statutory subject of bargaining. See 171 Vt. at 70, 759 A.2d at 483-84. Accordingly, subcontracting is a bargainable issue, not an inherent managerial right.

Applying the Labor Board's five-part, post-arbitral test here, I predict that, on remand, the Labor Board will decide not to defer to the arbitrator's decision. There are certainly good arguments to be made that the arbitrator's decision does not satisfy factor (3) because it is repugnant to the purpose of the Municipal Employee Relations Act. It is also highly questionable whether the arbitrator decided issues within his competency, factor (5). The Labor Board will not defer to the arbitrator, however, because the arbitrator clearly did *not* decide the unfair-labor practices claim, factor (4). The arbitrator expressed "no opinion on the question." Indeed, he states: "The VLRB did not defer any aspect of the unfair labor practice charge to arbitration, so there is no need to rule on that question." In view of this language in the arbitrator's decision, the Labor Board cannot defer to the arbitrator's decision because it does not resolve the dispute herein on whether the school board was required to bargain

with the union on subcontracting. Consequently, the Labor Board will be free to reissue a decision it has already made, the decision currently before us. And the school board will have another opportunity to appeal the same decision here for a second time.

Practically speaking, this remand does nothing but delay granting the relief ordered by the Labor Board — reinstatement, back pay and benefits — to the nine union workers illegally fired four years ago. Thus, even if I agreed with the majority that the Labor Board should have deferred this dispute to arbitration — which I do not — I would not remand at this point because the result of the remand is clearly dictated by the arbitrator's decision not to consider the unfair-labor-practice charge. The remand is futile.

I therefore dissent to section II of the majority decision, concluding that the Labor Board erred by declining to defer this dispute to arbitration, and to the majority's decision to remand this case.