## Burlington Area Public Employees Union, Local 1343, AFSCME, AFL–CIO v. Champlain Water District

[594 A.2d 421]

No. 88-016

Present: **Allen, C.J., Peck,**[1] **Gibson, Dooley and Morse, JJ.**

Opinion Filed May 24, 1991

---

[1] Justice Peck was present at oral argument, but did not participate in the decision.

*Blais, Cain, Keller & Fowler, Inc.*, Burlington, for Plaintiff-Appellee.

*Dennis W. Wells* of *Downs Rachlin & Martin*, Burlington, for Defendant-Appellant.

**Allen, C.J.** The Champlain Water District appeals from an order of the Vermont Labor Relations Board ordering it generally to refrain from conducting Step III grievance hearings without the presence of grievants and their union representatives during management's presentation, and ordering it to offer to grievant George Hedenberg and the Burlington Area Public Employees Union in the instant case the opportunity to attend a grievance meeting so conducted. We reverse and remand with direction for the Board to defer to the arbitration provided for in the collective bargaining agreement (agreement).

Grievant was dismissed from employment by the District, and the Union filed a grievance on his behalf. The matter progressed to Step III of the grievance process, which required the District's Board of Commissioners to hear the grievance at a regularly scheduled meeting. After hearing from the Union on grievant's claim that his dismissal violated the agreement, the Commissioners sought to hear management's explanation of the dismissal without grievant's presence. Section 14.7 of the agreement does not specify whether a grievant has a right to be present at the Step III hearing, either personally or through a Union representative. The provisions for the Step III hearing stand in contrast to the provisions for Steps I and II of the grievance process, which do specifically address the employee's right to be present. The Union objected to this procedure, and grievant and his Union representative left the meeting. The Board of Commissioners denied the grievance, and the Union appealed that decision to binding arbitration.

The Union did not file a separate grievance concerning the grievant's exclusion from the Step III hearing, but it filed an unfair labor practice charge with the Board, alleging that the District had violated 21 V.S.A. § 1726(a)(1)[2] of the Municipal Employee Relations Act (MERA) by making it impossible for the Union to represent grievant adequately.

The District moved for summary judgment before the Board on the ground that the Union should have filed a second grievance on this issue rather than an unfair labor practice charge. The Board considered the summary judgment motion with the merits of the unfair labor practice charge.

The Board noted that § 14.1 of the agreement defines a grievance as "a dispute as to the meaning or application of a specific written provision of the Agreement" and concluded that the grievant's right to be present at the Step III hearing did not "involve the interpretation of contractual language." The Board also found that the past practice of the District had been to allow grievants and their Union representatives to be present during the management portion of Step III grievance hearings involving suspension. Even though there had not been previous Step III grievance hearings involving dismissal, the Board concluded that the exclusion of the grievant and Union representative from this Step III dismissal hearing was a unilateral change in a mandatory subject of bargaining and hence was an unfair labor practice. The Board concluded that it should not defer its decision on the unfair labor practice charge until after the conclusion of the grievance process. We disagree, and remand for deferral to the grievance process provided in the agreement.

■■ Parties to a collective bargaining agreement are required to exhaust available contractual remedies before a statutory unfair labor practice charge will lie under 21 V.S.A. § 1726(a). See *AFSCME, Local 490, Bennington Dep't of Public Works & Police Units v. Town of Bennington*, 9 V.L.R.B. 195

---

[2] The statute provides:

(a) It shall be an unfair labor practice for an employer:

(1) To interfere with, restrain or coerce employees in the exercise of their rights guaranteed by this chapter or by any other law, rule or regulation.

(1986); *Burlington Educ. Ass'n v. Burlington Bd. of School Comm'rs*, 1 V.L.R.B. 335, 340 (1978). The Board should begin its analysis by considering if the issue contained in the complaint is subject to arbitration, irrespective of whether or not it might also be an unfair labor practice under MERA. If the issue is subject to arbitration, the contract grievance procedure should be applied, barring an overriding statute or deferral policy. As the Board said in *Burlington Education Association*:

> If this Board hears as an unfair labor practice a complaint which is a grievance without first requiring the complainant to utilize the dispute resolution procedures agreed to in the Collective Bargaining Agreement, the collective bargaining process would be undermined. . . . [A]n exhaustion of contract remedies doctrine . . . insures the integrity of the collective bargaining process by requiring the parties to collective bargaining agreements to follow the procedures they have negotiated to resolve contract disputes. This policy also encourages the parties to negotiate grievance procedures to resolve contract disputes which is sound labor relations policy. Labor relations stability depends on the parties working together to resolve disputes which directly affect them.

1 V.L.R.B. at 340. The NLRB stated the same proposition very clearly in *National Radio Co.*, 198 N.L.R.B. 527, 531 (1972) (discussing *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971):

> Here, as [in *Collyer*], an asserted wrong is remediable in both a statutory and a contractual forum. Both jurisdictions exist by virtue of congressional action, and our duty to serve the objectives of Congress requires that we seek a rational accommodation within that duality. We may not abdicate our statutory duty to prevent and remedy unfair labor practices. Yet, once an exclusive agent has been chosen by employees to represent them, we are charged with a duty fully to protect the structure of collective representation and the freedom of the parties to establish and maintain an effective and productive relationship.
>
> In this context, abstention simply cannot be equated with abdication. We are, instead, adjuring the parties to seek resolution of their dispute under the provisions of their own

contract and thus fostering both the collective relationship and the Federal policy favoring voluntary arbitration and dispute settlement.

The exhaustion doctrine does not bind the parties in this case if the issue raised before the Board does not qualify as a matter of contract interpretation, if an overriding statute negates deferral, or if the Board's own deferral guidelines indicate that deferral would not serve the purposes of the statute. As none of these contingencies are present here, exhaustion is required.

## I. Contract Interpretation.

The Board, distinguishing *AFSCME, Local 490* and *Burlington Education Association*, analyzed the central issue as follows:

At issue is the procedure adopted by the Employer during a grievance meeting on an employee's dismissal of having the Union present its case on behalf of the dismissed employee to the Board of Commissioners and then the Union and involved employee being absent when management presents its case. The procedure to be used by the Board of Commissioners during grievance meetings is nowhere addressed in the Contract and the Contract limits the definition of grievance to "a dispute . . . as to the meaning or application of a specific written provision of the Agreement." Thus, the contractual grievance procedure does not provide adequate redress for the alleged wrongs.

It begs the issue to state that the contract does not expressly state that employees may or may not be present at Step III hearings. Interpretation of an agreement may involve interpolating from a written text solutions not expressly spelled out in the text. Clearly, Step III hearings are creatures of contract and not required by statute. The Step III grievance process was an integral part of the agreement, and the question of what constitutes a valid, bona fide Step III hearing is an issue of contract interpretation. The issue of who may be in the room during such a proceeding is but one example of an incident or element of such a proceeding. Similar questions might conceivably arise as to the length of the proceeding, whether recording devices are allowed, and the order of presentation. The answers

to all of these issues might be found by interpreting the text of the agreement or, as the Board points out, in blending textual interpretations and the "contracts implied in fact" in the form of established past practices. An arbitrator is ideally poised to consider and resolve such issues; they are issues concerning the "law of the shop" as opposed to the "law of the land," see *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728, 743 (1981), which arbitrators, in general, are in a better position than judges to interpret.

In sum, the procedures to be used at a Step III grievance hearing must be determined by comparing the specific written provisions of Article III and § 14 of the agreement and by determining whether those provisions allow the District's Board of Commissioners to exclude the grievant from a portion of a Step III grievance hearing. This is a suitable subject for deferral to the grievance process provided in the agreement. See *AFSCME, Local 490*, 9 V.L.R.B. at 195; *Burlington Educ. Ass'n*, 1 V.L.R.B. at 340–45.

## II. Established Past Practice.

The Board in the present case also reasoned that since the presence of all parties at Step III proceedings was an established past practice, exclusion of the grievant in this case was a unilateral change, comparable to the sick-leave policy at issue in *Burlington Firefighters Association Local 3044, IAFF v. City of Burlington*, 10 V.L.R.B. 53 (1987), or the smoking policy at issue in *Mt. Abraham Education Association v. Mt. Abraham Union High School Board*, 4 V.L.R.B. 224 (1981). We defer to the Board's factual determination that allowing all parties to be present at Step III proceedings was an established past practice. The error the Board committed, however, was in concluding that because a violation of MERA could be made out—a point we accept arguendo—the Board should not defer to the contractual grievance process. Many grievances can be related to the kind of activities covered under MERA. If the deferral were limited to cases where grievances implicated no possible statutory violation, deferral would be rare indeed.

The Board's reliance on *Burlington Firefighters Association* is misplaced. In that case the City attempted to impose an en-

tirely new sick-leave policy during the term of a collective bargaining agreement. The agreement in force addressed sick leave in considerable detail, and there was no suggestion by the City or the Association that the new sick-leave policy was consistent with the agreement or that it involved the interpretation of contractual language. The Board detailed in its findings of fact the differences between the old sick-leave policy and the new and stated in its opinion that "[t]here also is no issue whether the policy constituted a change in conditions of employment from what had previously existed. It is clear that such a change occurred. The question is whether the Employer met its obligation to bargain in good faith with the Association before instituting the changes." 10 V.L.R.B. at 59. In short, *Burlington Firefighters* was a case involving an alleged violation of MERA that proceeded on the understanding of all parties that the issue was not the interpretation of a contract term, but rather whether a change in the contract had been imposed consistently with law.

*Mt. Abraham Education Association* is likewise inapplicable. In that case the school directors promulgated a new smoking policy without consulting the Association. The Association pursued a grievance remedy under its collective bargaining agreement. The question of the arbitrability of the issue was presented to an arbitrator, who decided that the matter was not arbitrable. The arbitrator did not reach or decide the merits of the grievance. The Association then pursued its statutory rights, asserting that the change in working conditions was a violation of the school board's duty to bargain under the statute applicable to school agreements. Thus, the case proceeded in a context in which deferral could not possibly arise, as it had been explicitly decided and excluded in a prior proceeding.

## III. Deferral Policies.

In addition to scrutinizing contract language, which should be the principal means of effectuating the parties' intentions, the Board, following the practice of the NLRB, has been guided in the past by general policy guidelines that aid in the analysis and disposition of cases that fall under both a labor statute and particular collective bargaining agreements. See *Burlington Educ. Ass'n*, 1 V.L.R.B. at 342–45; Sharpe, *NLRB Deferral to*

*Grievance-Arbitration: A General Theory*, 48 Ohio St. L.J. 595 (1987). Professor Sharpe summarizes the current prevailing criteria under the analogous provisions of the Federal Labor Relations Act, 29 U.S.C. § 158(a)(1), for a determination of the appropriateness of grievance arbitration:

[I]n order to determine whether the grievance procedure is capable of resolving the dispute's unfair labor practice issues, the Board considers the stability of the collective bargaining relationship, the respondent's willingness to use the contractual procedure, the likelihood that individual interests would be defended fairly during the process, and the scope of the grievance procedure and its ability to encompass the unfair labor practice dimensions of the dispute.

*Id.* at 642. In Vermont, it is the Board that is in the best position to develop deferral policies, and in *Burlington Education Association* it announced a deferral policy not unlike that of the NLRB:[3]

In determining whether to require the exhaustion of remedies doctrine, this Board will consider whether the action of the employer is designed or would have the effect of significantly undermining the union. The Board will examine the nature of the alleged unfair labor practice and its effect on the union and its members. The Board will defer to the arbitration procedure when it believes the dispute involves the interpretation of a contract.

. . . .

... The Board will review whether the proceedings were tainted by fraud, collusion, unfairness or serious procedural irregularities or that the award was clearly repugnant to the purposes and policies of the Vermont Labor Relations Act for Teachers.

1 V.L.R.B. at 343–44.

It is not our purpose in this opinion to declare what the Board's deferral policies should be, so long as they are within

---

[3] Although *Burlington Education Association* arose in the context of the Vermont Labor Relations Act for Teachers, the broad policies announced by the Board were not limited to cases arising under that act.

the range of the Board's statutory authority. Such policy pronouncements, like those in *Burlington Education Association*, are for the Board to consider and enunciate, within the boundaries implicit in its statutory mandate. Our sole concern with the Board's decision in the present case is that the central issue—employee presence at a Step III hearing—is a matter of contract interpretation, whether or not it is also an issue under 21 V.S.A. § 1726(a)(2), and no policies presently recognized by the Board appear to bar deferral.[4]

Finally, the fact that the dispute over presence of the grievant arose in the course of another grievance "does not appear to be of such character as to render the use of [the grievance-arbitration] machinery unpromising or futile." *United Aircraft Corp.*, 204 N.L.R.B. 879, 879 (1972), *enforced sub nom. Lodges 700, 743, 1746, International Ass'n of Machinists & Aerospace Workers v. NLRB*, 525 F.2d 237 (2d Cir. 1975).

Because we have remanded for the application of the deferral doctrine, it is unnecessary for us to address appellant's remaining issues: whether the District was deprived of due process because the violation found by the Board was not one charged in the Union's complaint, and whether the Union waived its right to be protected from unilateral changes in mandatory bargaining subjects.

*Reversed and remanded for proceedings consistent with this opinion.*

**Dooley, J.,** concurring. I am unable to conclude that the unfair labor practice complaint in this case involves the meaning or application of the bargaining agreement's specific written provisions. None of the provisions of the bargaining agreement specify the procedure at a Step III grievance hearing. I concur,

---

[4] In fact, the Union representative stated before the Board:

> I agree we could have filed a grievance because it's a past practice. I'm not saying we couldn't have filed a grievance. I'm saying that we feel that [except] for when we're looking for back pay or reinstatement in a job, we have a right to take either the Board or the grievance procedure[,] which[ever] is more convenient for us.

The Union is candid in its view, and might have bargained for that option. However, we are limited to the contract before us, and its provisions do not support the Union or the plaintiff on this question.

however, because I do not believe that the Union made a sufficient showing to establish a custom and practice that has become an implied part of this contract. To find a custom and practice, "the conduct of the parties must encompass a continuity, interest, purpose and understanding which elevates a course of action to an implied contractual status." *General Committee of Adjustment v. Burlington Northern*, 620 F.2d 161, 163 (8th Cir. 1980).

The Board's conclusion is based on its finding that "the Board of Commissioners had held several Step III grievance meetings concerning disciplinary suspensions of employees" and that in all those hearings the Union representative and involved employee were permitted to remain in the room during management's presentation. The evidence in support of this finding comes from two witnesses. Grievant testified that he had grieved suspensions four or five times in the past and that, in each instance, "we [grievant and the Union] all stayed in the room" and management presented its case first. The District operations supervisor stated that during Step III suspension hearings he was involved in "for the most part we normally went first getting facts and [the Union] normally went second."

At best, the evidence showed that, at some hearings in the past, the procedure was as the Union wanted. It is far short of showing "continuity, interest, purpose and understanding" to elevate a course of action to an implied contractual status.