2008 VT 58

## In re Grievance of Mary Ellen Cole and Charles Cross

[954 A.2d 1307]

No. 06-472

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed May 2, 2008

66

*Jes Kraus*, Associate General Counsel, Vermont State Employees' Association, Montpelier, for Appellants.

*William H. Sorrell*, Attorney General, and *Bridget C. Asay*, Assistant Attorney General, Montpelier, for Appellee.

¶ 1. **Burgess, J.** Grievants Mary Ellen Cole and Charles Cross appeal a decision of the Vermont Labor Relations Board dismissing their grievance over the Department of Corrections' application of the State's conflict-of-interest personnel policy to the parties. The policy prohibits Cole from working on the same shift as her partner, Cross, who would be supervising Cole if they were

so assigned. The Board concluded that the personnel policy was a past practice embedded in grievants' collective-bargaining agreement, and that it did not conflict with language in the agreement governing the distribution of overtime and shift-bidding. As such, the policy applied to grievants and restricted the shifts that grievant Cole could work. We affirm.

¶ 2. Grievants, domestic partners since 2001, both work at Northwest State Correctional Facility (NWSCF). Cross works as a correctional facility shift supervisor (CFSS), a position he has held since 1999. In this capacity, he is "responsible for security operations" in the prison and "addresses security and staff performance concerns that may arise during the shift." Cross directly supervises employees designated as correctional officer II (COI II); COI IIs in turn supervise employees designated correctional officer I (COI I). Both COI Is and COI IIs are "subject to direction and supervision" from the CFSS on duty, and may receive performance feedback from the CFSS. Cole began work as a COI I at NWSCF in June 2000.

¶ 3. Both grievants are employed pursuant to a collective-bargaining agreement (the contract). Article 2 of the contract governs "Management Rights":

> subject to terms set forth in this Agreement, nothing in this Agreement shall be construed to interfere with the right of the Employer to carry out the statutory mandate and goals of the agency, to restrict the State in its reserved and retained lawful and customary management rights, powers, and prerogatives, including the right to utilize personnel, methods and means in the most appropriate manner possible.

Article 20 provides that "[COI Is] with more than three (3) years seniority . . . shall receive shift assignments based on seniority." Article 28 governs the distribution of overtime, and states that "[a]ppointing authorities shall make a reasonable effort to distribute overtime as equitably as possible among classified employees."

¶ 4. Also relevant to this dispute are the State personnel policies and procedures governing conflicts of interest. The State has had a conflict-of-interest policy since 1966. In its current form that policy is embodied in personnel policy Number 5.2. Number 5.2 sets forth "the general policy of the State that no one will be employed in the same department, institution, or organizational

unit that employs a relative." For purposes of the policy, the term "relative" includes spouses, civil union partners, and domestic partners. Employees may request a waiver so they may be employed in the same department as a relative. Waivers are submitted to the Department of Human Resources, which evaluates each waiver based on a number of factors, including the type of relationship, size of the department, "reporting relationships within the organization," and location of the employer. When a conflict of interest arises during employment, "the employer must take all reasonable and practicable measures, including, but not limited to, changes in supervision, work location, and/or work shift, to avoid to the greatest extent possible the conflict or the appearance thereof."

¶ 5. Under Article 20 of Cole's contract, she became eligible to bid for shifts in the summer of 2003. At that time, she had been working on the third shift, while Cross was assigned to first shift. Cole put in a request to work on the first shift, and it was denied due to the conflicts policy. She then filed a grievance, but withdrew it before it was heard by the Board.

¶ 6. Cole then attempted to obtain a waiver from the Department of Human Resources so she and Cross would be allowed to work the same shift. In 2005, a waiver was issued, which allowed their continued employment at NWSCF, but mandated that there be "no work contact between the employees," that they work "separate shifts at all times," and that the two have "entirely separate reporting relationships." Grievants acknowledged this waiver, but maintained that it did not apply to them. At the next shift-bidding cycle, Cole again attempted to bid for work on the first shift and was again denied her request.

¶ 7. Cole, joined by Cross, grieved this denial to the Board. They challenged the denial of Cole's request to work on the first shift and the refusal to allow them to work overtime on the same shift, claiming the contract provisions on shift-bidding preempted the conflicts policy. The Board held a hearing and issued a decision dismissing the grievance. The Board found that, because the contract did not specifically address conflicts of interest, the State's conflict-of-interest policy was not superseded by the contract terms. Moreover, because the parties bargained with knowledge of this conflict-of-interest policy, it was a "past practice implicitly embedded in the contract."

¶ 8. Grievants appeal the Board's decision to dismiss their grievance, raising four contentions on appeal: (1) the Board erred in concluding that there was no conflict between the provisions of the collective-bargaining agreement and the personnel policy; (2) the Board erred when it found that the personnel rules are implicitly embedded in the contract; (3) the Board's decision contradicts the plain language of the contract; and (4) the Board's conclusion imposes an "insurmountable burden" on collective bargaining in Vermont.

## I.

¶ 9. We first address grievants' claim that the Board erred in concluding that no conflict existed between the terms of the contract and the State personnel policy governing conflicts of interest. "Interpretations of collective bargaining agreements are within the particular expertise of the Board, and we review such interpretations with great deference to the Board's expertise." *In re West*, 165 Vt. 445, 448, 685 A.2d 1099, 1102 (1996); see also *In re Vt. State Employees Ass'n*, 2005 VT 129, ¶ 7, 179 Vt. 228, 893 A.2d 333; *In re Gregoire*, 166 Vt. 66, 72, 689 A.2d 431, 435 (1996) ("Substantial deference must be accorded the Board's construction of collective bargaining agreements.").

¶ 10. Grievants cite *In re Muzzy*, 141 Vt. 463, 449 A.2d 970 (1982), in support of their claims. In *Muzzy*, a State employee challenged her dismissal, arguing that the State failed to follow proper dismissal procedures when it fired her after several unsatisfactory performance reviews. The collective-bargaining agreement provided that progressive disciplinary steps would be used before an employee was dismissed. The State, relying partly on its internal rules and regulations for personnel administration, dismissed the employee without progressive discipline, arguing that a dismissal for "inability to perform" was not covered by the contract terms. *Id.* at 474-76, 449 A.2d at 975-76. We rejected this argument, holding that because the contract provision governing "dismissal" did not specify that it applied only to certain types of dismissal, it applied to all dismissals. Because the language of the collective-bargaining agreement "clearly and unambiguously" addressed dismissal procedures, its terms trumped the language of the State's rules regarding dismissals, and the State was required to follow the bargained-for provisions. *Id.* at 476, 449 A.2d at 976.

■ ¶ 11. We reached a similar result in *In re Graves*, 147 Vt. 519, 520 A.2d 999 (1986). In *Graves*, an employee was dismissed after he submitted fourteen false claims for reimbursement for lunch expenses. The employee argued that this dismissal was improper because the State had an obligation to discipline him by suspending his reimbursement privileges before it could dismiss him, and it had not done so here. He pointed to a provision in the State's Standard Operating Procedures that stated that the employer "*shall* revoke midday meal reimbursement privileges where there is continuing indication of abuse." *Id.* at 521, 520 A.2d at 1000. The employee's collective-bargaining agreement, however, contained a provision addressing the same issue, stating that the employer "*may* revoke midday meal reimbursement privileges where there is continuing indication of abuse." *Id.* at 522, 520 A.2d at 1001. Invoking the rule established in *Muzzy*, we held that "where the language of a collective bargaining agreement is clear and unambiguous, employment rules and regulations promulgated unilaterally by the employer-state which conflict with the contract terms are superseded by the contract." *Id.* As both the contract and the Operating Procedures addressed the same issue, the contract language controlled; because the contract did not mandate that the employer suspend expense privileges before dismissal, the State could properly dismiss the employee without first disciplining him.

■ ¶ 12. Both *Muzzy* and *Graves* focused on the language of the contract, concluding that when a collective-bargaining agreement and an employer's personnel rules address the same topic, the bargained-for language of the contract controls over the employer's unilaterally promulgated rules. This rule provides no support to grievants' argument here because there is no conflict between the language of the contract and the State's conflict-of-interest policy. The contract provisions at issue — those establishing procedures for the distribution of overtime and shift-bidding — do not cover the same subject matter as the contested personnel policy, which addresses conflicts of interest in the workplace. Accordingly, there is no clash between the personnel policy and the contract, and we affirm the Board's interpretation of the agreement.

## II.

¶ 13. Grievants' next claim is that the Board erred in concluding that the "personnel rules . . . were a past practice implicitly embedded in the contract, where the parties bargained with the knowledge that the personnel rules were applicable and no contract provision addressed the applicable personnel rule." Generally, we look to the plain language of a contract to discern the intent of the parties. See *In re Stacey*, 138 Vt. 68, 71, 411 A.2d 1359, 1361 (1980). We have held, however, that an "implied contractual provision may arise through established past practices, where the conduct of the parties . . . encompass[es] a continuity, interest, purpose and understanding which elevates a course of action to an implied contractual status." *Gallipo v. City of Rutland*, 163 Vt. 83, 88, 656 A.2d 635, 639 (1994) (quotation and citation omitted).

¶ 14. In *Gallipo*, a senior firefighter challenged the fire department's decision to pass him over for a promotion, arguing, inter alia, that he had been denied the promotion in violation of an "implied contractual provision justifying an expectation of promotion based on seniority." *Id*. We recognized that such implied provisions may arise, and looked to the past course of conduct at the firehouse regarding seniority and promotions to ascertain whether the claimed past practice existed. *Id*. We ultimately rejected the firefighter's claim because the course of conduct did not establish an implied contractual obligation when some experienced firefighters had been promoted based on seniority in the past, but others had not. *Id*. Such inconsistent hiring practice evidenced no implied right to promotion based on seniority alone. *Id*.

¶ 15. Although *Gallipo* did not arise in the collective-bargaining context, this Court has similarly held that past practices may be considered when interpreting a collective-bargaining agreement. See *Milton Educ. & Support Ass'n v. Milton Bd. of Sch. Trs.*, 2003 VT 42, ¶ 8, 175 Vt. 531, 824 A.2d 605 (mem.) (an arbitrator interpreting a collective-bargaining agreement may examine past practices); *Burlington Area Pub. Employees Union v. Champlain Water Dist.*, 156 Vt. 516, 521, 594 A.2d 421, 424 (1991) (considering "textual interpretation and . . . 'contracts implied in fact' in the form of established past practices" to interpret provisions of a collective-bargaining agreement). Other courts have

also recognized that past practices may become implied terms in a collective bargaining agreement. See *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 308 (1989) (recognizing that "[c]ollective-bargaining agreements often incorporate . . . implied terms"); *Bonnell/Tredegar Indus., Inc. v. NLRB*, 46 F.3d 339, 344 (4th Cir. 1995) ("An employer's established past practice can become an implied term of a collective bargaining agreement.").

¶ 16. The Board has long recognized this principle, holding that past practices are "in essence . . . a part of the parties' whole agreement." *In re Beyor*, 5 V.L.R.B. 222, 238 (1982).[1] Particularly relevant to the instant case are decisions where the Board has held that personnel policies may become implied contractual provisions. In *In re Allen*, 5 V.L.R.B. 411, 418 (1982), the Board concluded that "where . . . the parties have bargained with the knowledge the *Personnel Rules* are applicable, [they] are a past practice implicitly embedded in the Contract unless explicitly altered by the Contract." The Board accorded similar status to personnel rules in *In re Cronin*, 6 V.L.R.B. 37, 67 (1983), stating that "day-to-day practices mutually accepted by the parties may attain the status of contractual rights and duties, particularly where they are long standing and not at variance with contract provisions." Although "Personnel Rules do not apply where a contract provision addresses the same issue that is covered by the Personnel Rules," where no contractual term addresses the topic, the personnel rules remain in force. *Id.* at 70.

■ ■ ¶ 17. We agree with the Board's approach, and here extend the *Gallipo* principle that past practices may give rise to an implied contractual provision in the collective-bargaining context. This approach leads us in the present case to affirm the Board's determination that the State's conflict-of-interest policy is embedded in the contract as a past practice. The State has had personnel rules governing conflicts of interest in place since 1966, long before the parties negotiated the first shift-bidding provision in 1984. This policy has been enforced on a number of occasions in the Department of Corrections.[2] The parties bargained with the

---

[1] The Board decisions referenced in this opinion are available at http://www.state.vt.us/vlrb.

[2] The Board discusses six instances where the conflict-of-interest policy was applied to other couples in the Department of Corrections. Generally, the Department of Human Resources approved waivers for these couples to continue working

knowledge of these conflict-of-interest policies, and the contract contains a term — Article 2 — recognizing the State's rights to enforce such personnel policies, yet nothing in the contract explicitly alters, or even addresses, the application of the conflict-of-interest policy. Given these factors and the longstanding existence of, and important policy reasons underlying, the State's conflict-of-interest policy, see *infra*, ¶ 21, we affirm the Board's conclusion that the policy is impliedly embedded in the contract as a past practice.

## III.

¶ 18. We next address grievants' claim that the Board's conclusion contradicts the plain language of the contract. Grievants contend that the provision governing shift-bidding is unambiguous, granting these rights unconditionally to all employees based on seniority, and that the personnel policy deprives them of their contractual right to bid for shifts.

¶ 19. We agree with grievants that contractual terms are to be interpreted based on their plain meaning. See *Congdon v. Auto. Club Ins. Co.*, 174 Vt. 586, 586-87, 816 A.2d 504, 506 (2002) (mem.). We look to the plain meaning of individual terms, but contract provisions "must be viewed in their entirety and read together." *In re Stacey*, 138 Vt. at 72, 411 A.2d at 1361. "The cardinal principle in the construction of any contract is to give effect to the true intention of the parties." *In re Cronan*, 151 Vt. 576, 579, 563 A.2d 1316, 1317 (1989). To the extent that contract provisions are ambiguous, "the practical construction placed upon an instrument by the parties would be controlling in determining the meaning of the instrument." *Id.*

¶ 20. Grievants correctly point out that Cole's right to bid for shifts and overtime is incidentally burdened by the conflict-of-interest policy in this circumstance. Determining the parties' intent with regard to these provisions thus requires a "practical construction" of the contract, evaluating the context in which the parties negotiated to determine the parties' intent. Here, the parties negotiated Article 2, which recognizes the State's right to promulgate and enforce personnel policies necessary for managing the workplace, Article 20, which governs shift-bidding, and Article

---

together, provided that there was "no direct work contact between the[] individuals," and that they had "disparate work functions" and "different supervisors."

28, regarding overtime. They negotiated these terms under an overarching State personnel policy governing conflicts of interest that had been in place for almost forty years, well before the shift-bidding provisions were originally negotiated in 1984.

¶ 21. Such a policy is vital to workplace management. Because of the problems long associated with "conflicts of interest and the appearance thereof" in the workplace — including "real or perceived favoritism, negative effects on employee morale, inadequate or inappropriate supervision, and possible performance problems" — as a public employer the State has an inherent interest in establishing personnel policies to deal with these conflicts in the workplace. In the context of a correctional facility, these concerns are particularly acute. If inmates were to become aware that a close relationship existed between two prison employees, they could manipulate one or both of the individuals, resulting in potential danger to the employees or other inmates. The Board concluded that, in particular, a "security risk would be created . . . if a supervisory relationship existed between correctional officers who were domestic partners," because "[i]f inmates physically endangered one partner . . . this could have an effect on the judgment of the other partner in responding to the situation." This conflict-of-interest policy has been enforced in the corrections context numerous times. See *supra*, n.2.

¶ 22. Despite this long-established and enforced policy in the Department of Corrections, however, no provision in the contract addresses or purports to modify the application of the policy. Instead, the parties expressly included Article 2, which recognizes the right of the State to apply such personnel policies. Given the institutionalization of the State's conflict-of-interest policy, the important management policy justifying its enforcement, and the Board's finding that "the parties bargained with the knowledge that the conflicts of interest policy was applicable and no contract provision addressed the policy," we uphold the Board's "practical construction" of the instrument and reject grievants' interpretation of the shift-bidding provision. See *Gregoire*, 166 Vt. at 72, 689 A.2d at 435 (discussing the "[s]ubstantial deference" which must be accorded the Board's construction of collective bargaining agreements).

## IV.

¶ 23. Grievants' last claim is that enforcing the personnel policy would place an "insurmountable burden on the collective bargaining process in Vermont" because in the future negotiators will have to "review[] each and every policy maintained by the employer, and compar[e them] to all proposed contract language to determine whether or not a conflict exists." We fail to see the problem. Today's holding simply effectuates the contract negotiated by the parties, acknowledging the longstanding personnel policies embedded in the agreement and giving effect to the provisions of Article 2 that the employer "reserved and retained" its "customary management rights, powers and prerogatives . . . to utilize personnel, methods and means in the most appropriate manner possible" in the workplace. Because the contract specifically includes this term and the conflict-of-interest policy had been in force for nearly forty years and so was customary when the agreement was negotiated, we presume that the negotiators understood its effect. We do not create extra work for parties by enforcing provisions they themselves negotiated during the collective-bargaining process.

*Affirmed.*