NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 88

No. 2019-045

| | |
|---|---|
| Commercial Construction Endeavors, Inc. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Addison Unit, |
| | Civil Division |
| | |
| Ohio Security Insurance Company | September Term, 2019 |

Helen M. Toor, J. (summary judgment orders); Alison S. Arms, J. (final judgment)

Kevin E. Brown of Langrock Sperry & Wool, LLP, Middlebury, for Plaintiff-Appellant.

Susan J. Flynn of Clark Werner & Flynn PC, Burlington, and Paul T. Sullivan of Zelle LLP, Framingham, Massachusetts, for Defendant-Appellee/Cross-Appellant.

PRESENT: Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Morris, Supr. J. (Ret.), Specially Assigned

¶ 1. **EATON, J.** On a winter night in 2014, strong winds blew through the town of Georgia, causing a partially constructed livestock barn to collapse. Commercial Construction Endeavors, Inc. (CCE), the contractor building the barn, sought recompense for the resulting losses from its insurer, Ohio Security Insurance Company. However, insurer and insured disagreed as to policy coverage for costs incurred by CCE in removing the remains of the collapsed barn and rebuilding it to its pre-collapse state. Ultimately, CCE sued Ohio Security for breach of contract. In successive summary-judgment rulings, the trial court held that the contractor's rebuilding expenses were covered under the policy, but the cost of debris removal was not. Ohio Security

cross-appeals from the first ruling and CCE appeals from the second; we reverse the first ruling and affirm the second.[1]

¶ 2.     The essential facts are undisputed. CCE was hired to construct a livestock barn in Georgia, Vermont. By late December 2014, the barn was partially complete—the foundation had been laid, wood framing erected, and roof trusses installed. However, on the night of Christmas Eve or early Christmas morning, strong winds caused the structure to collapse. CCE subsequently began clearing debris and rebuilding the barn, incurring additional labor and material costs.

¶ 3.     CCE reported the collapse to Ohio Security shortly after it occurred, and the adjustment process began. Ohio Security determined that CCE was at fault because the barn was not properly braced to withstand the weather conditions, and that the resulting loss was covered under a policy endorsement for "Off[-]Premises Property Damage Including Care, Custody, or Control," which provided coverage for damage to real property upon which CCE was performing operations where the damage resulted from those operations. Upon adjustment, Ohio Security paid CCE $24,750—the full amount available under that endorsement, less an applicable $250 deductible.

---

[1] Following oral argument in this matter, CCE submitted a document seeking, inter alia, to direct the Court's attention to portions of the printed case pursuant to Vermont Rule of Appellate Procedure 28(j). Ohio Security then requested that the Court strike these portions of the document, arguing that the record materials referenced by CCE do not constitute "authorities" within the meaning of Rule 28(j). We deny Ohio Security's motion to strike because CCE's submission has no bearing on our analysis. Cf. In re Dep't of Bldgs. & Gen. Servs., 2003 VT 92, ¶ 16 n.2, 176 Vt. 41, 838 A.2d 78 (denying motion to exclude opposing party's filing under supplemental-authority provision of Rule 28 where "little prejudice" resulted). Through its citations, CCE sought to support the factual assertion that Ohio Security requested a policy release in exchange for its payment under the off-premises property damage endorsement because its agents knew coverage also lay under the property floater. However, this proposition is wholly irrelevant to our analysis: because we conclude herein that the language of the floater is unambiguous, we do not look to extrinsic evidence of the parties' intent. See Southwick v. City of Rutland, 2011 VT 105, ¶ 5, 190 Vt. 324, 30 A.3d 1298 ("When the plain language of [a contract] is unambiguous, we take the words to represent the parties' intent . . . ." (emphasis added) (citation omitted)).

2

¶ 4. However, although Ohio Security indicated that the off-premises endorsement payment exhausted the coverage available under the policy, CCE asserted that coverage was also available under the "Property Floater Coverage Form" included therein. The floater, captioned "COMMERCIAN [sic] INLAND MARINE," read, in relevant part, as follows:

A. COVERAGE

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

1. COVERED PROPERTY, as used in this Coverage Form, means:

Business personal property you own, including but not limited to equipment, tools, items, or materials to be installed and office business personal property. Business personal property owned by others including but not limited to employees [sic] tools or rented equipment or tools, while they are in your care, custody or control and for which you have accepted responsibility.

. . . .

3. COVERED CAUSES OF LOSS

Covered Causes of Loss means RISK OF DIRECT PHYSICAL "LOSS" to Covered Property except those causes of "loss" listed in the Exclusions.

4. ADDITIONAL COVERAGE – COLLAPSE

We will pay for direct "loss" caused by or resulting from risks of direct physical "loss" involving collapse of all or part of a building or structure caused by one or more of the following:

a. [W]indstorm . . . as covered in this Coverage Form;

. . . .

3

f.      Use of defective materials or methods in construction . . . if the collapse occurs during the course of the construction . . . .

5.      COVERAGE EXTENSION

a.      DEBRIS REMOVAL

(1)    We will pay your expenses to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the direct physical loss or damage[.]

Section B of the floater, titled "Exclusions," went on to provide that insurer would not pay for "loss" caused by or resulting from "[c]ollapse except as provided in the Additional Coverage – Collapse section of the Coverage Form."

¶ 5.    Ohio Security determined that there was no coverage for CCE's loss under the floater, advising its insured that "the policy does not provide coverage 'for materials after they have been installed into the building project under the Property Floater Coverage.' "  CCE sued Ohio Security for breach of contract, contending that coverage lay under A(4)(a) and (f) of the floater.

¶ 6.    In the first of two summary-judgment motions, Ohio Security argued that its off-premises endorsement payment exhausted the coverage available for the barn's collapse under the policy because: the property floater, in section A, unambiguously limited its coverage to losses to "Covered Property"; "Covered Property" was defined as "[b]usiness personal property"; and the unfinished barn did not meet the definition of "business personal property" in A(1) because it was comprised of materials which had already been installed in a structure.  In its response, CCE

4

disputed that the components of the barn were transformed from business personal property to real property upon installation, but argued that such characterization was irrelevant in any event because the "Additional Coverage – Collapse" subsection—in contrast to other portions of the floater—did not expressly limit coverage to "Covered Property," and, therefore, the coverage provided by that subsection was not confined to business personal property.

¶ 7.     The trial court categorized the barn as real property, not business personal property, but denied Ohio Security's summary judgment motion.  Because it found merit in both parties' arguments, it concluded that the policy was necessarily ambiguous, noting that, "in the insurance world, ties go to the insured."  Thus, the court held that the "Additional Coverage – Collapse" subsection was not limited to "Covered Property" as defined therein.

¶ 8.     In its second summary-judgment motion, Ohio Security argued that the "Debris Removal" provision in the property floater at A(5)(a) did not provide coverage for costs incurred by CCE in removing the collapsed structure because these costs were not submitted within the 180-day timeframe set forth in the policy, and, in any event, the debris-removal coverage extension was explicitly limited to "Covered Property," and the unfinished barn was not "Covered Property." CCE no longer argued that the barn was "Covered Property," conceding that the debris-removal provision was thus inapplicable.  However, it asserted that it could recoup debris-removal costs through the "Additional Coverage – Collapse" provision as the court construed it in response to the first summary judgment motion, because debris removal constituted a "loss."  The court concluded that the 180-day deadline did not bar coverage because Ohio Security failed to show prejudice, but determined that the express provision for debris-removal coverage in A(5)(a) compelled the conclusion that debris removal was not covered in the collapse coverage in A(4) by its use of general term "loss."

¶ 9.     This Court reviews summary-judgment rulings de novo, applying the same standard as the trial court—a grant of summary judgment will be affirmed when there exist no

5

genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law. Vt. Agency of Nat. Res. v. Parkway Cleaners, 2019 VT 21, ¶ 11, __ Vt. __, 210 A.3d 445 (citing V.R.C.P. 56(a)). Here, the material facts are undisputed; rather, both appeal and cross-appeal turn on the trial court's interpretation of the insurance policy. Because an insurance policy is a contract, its interpretation is a question of law, and our review is nondeferential and plenary. Shriner v. Amica Mut. Ins. Co., 2017 VT 23, ¶ 6, 204 Vt. 321, 167 A.3d 326.

¶ 10. "Proper insurance contract interpretation requires that the policy provisions be read together and viewed as an integrated whole." Waters v. Concord Grp. Ins. Cos., 169 Vt. 534, 536, 725 A.2d 923, 926 (1999) (mem.). Because policies are interpreted according to their terms and the intent of the parties as expressed through policy language, "disputed terms are to be given their plain, ordinary[,] and popular meaning." Id. However, "[a]ny ambiguity in an insurance contract must be construed in favor of the insured." Chamberlain v. Metro. Prop. & Cas. Ins. Co., 171 Vt. 513, 514, 756 A.2d 1246, 1248 (2000) (mem.). This was the principle the trial court applied in deciding the first summary-judgment motion in CCE's favor.

¶ 11. But this principle is not without limitation. Although any ambiguity in policy language must be construed in the insured's favor, "the insurer is not to be deprived of unambiguous provisions included in a policy for its benefit." Waters, 169 Vt. at 537, 725 A.2d at 927. Thus, while "[t]here are no easy guidelines for determining whether language in an insurance contract is ambiguous," we will so conclude only where "it is reasonably or fairly susceptible of different constructions." N. Sec. Ins. Co. v. Hatch, 165 Vt. 383, 386, 683 A.2d 392, 395 (1996). If a contract, even one "inartfully worded or clumsily arranged, fairly admits of but one interpretation, it may not be said to be ambiguous or fatally unclear." Isbrandtsen v. N. Branch Corp., 150 Vt. 575, 580-81, 556 A.2d 81, 85 (1998). Rather, we will find ambiguity only where a policy "in and of itself supports a different interpretation from that which appears when it is read

6

in light of the surrounding circumstances, and both interpretations are reasonable." Webb v. U.S. Fidelity & Guar. Co., 158 Vt. 137, 139, 605 A.2d 1344, 1346 (1992) (quotation omitted).

¶ 12. We begin our review with the first summary-judgment motion. There, the dispositive question is whether use of the term "Covered Property" in some portions of the floater—but not in the additional collapse coverage subsection—creates an ambiguity, requiring the conclusion that additional collapse coverage is not limited to "Covered Property." The parties do not dispute that "Covered Property," as defined in the property coverage floater, is limited to business personal property, and do not dispute that the collapsed barn is not business personal property. Because the first sentence of section A states that Ohio Security will pay only for " 'loss' to Covered Property," we conclude that the collapse coverage section, A(4), is unambiguous: the only reasonable interpretation of the floater is that the limitation expressed in A as to "Covered Property" applies equally to all subsections of A, including A(4).

¶ 13. CCE argues that this case is similar to DeBartolo v. Underwriters at Lloyd's of London, 2007 VT 31, ¶ 21, 181 Vt. 609, 925 A.2d 1018 (mem.). In DeBartolo, we held that loss to a recently-reopened restaurant was covered under an insurance policy which included declarations describing the covered property as a "vacant restaurant." Id. ¶ 3. From CCE's perspective, it is of particular significance here that, in DeBartolo, we declined to imply a use limitation in property coverage on the basis of the language in a declaration, noting that the insurer included use limitations in the policy's commercial general liability coverage, and could simply have extended that limiting language to the property coverage if it intended to do so. Id. ¶ 12. On this basis, CCE asserts that if the limitation of property floater coverage to "Covered Property" is to have meaning, then the court cannot imply the term into the additional collapse coverage section.

¶ 14. "The law is clear that an agreement must be viewed in its entirety, with an eye toward giving effect to all material parts in order to form a harmonious whole." Isbrandtsen, 150 Vt. at 580, 556 A.2d at 85. However, CCE's argument overlooks a vital structural difference

7

between the DeBartolo policy and the one at issue here. With regard to the former, we emphasized that "the usual purpose of the premises description in the declarations" is "to describe a location, not to proscribe the use to which the premises are put, a function served by other policy provisions." DeBartolo, 2007 VT 31, ¶ 12. Also militating against implying a use limitation in property coverage were "the policy's explicit exclusion of several causes of loss other than opening the restaurant, the policy's explicit limitation of [commercial general liability] coverage to operations described in the declarations, and the vacancy permit." Id. ¶ 21. But in this case, applying the limiting language in A to subsection A(4) requires no inferential leap. This is so because as employed in contracts, the very purpose of a section is to set forth more general information applying to each of the subsections that follow. See In re Cole, 2008 VT 58, ¶ 19, 184 Vt. 64, 954 A.2d 1307 ("We look to the plain meaning of individual terms, but contract provisions must be viewed in their entirety and read together." (quotations omitted)). Thus, the clear import of A(4) is an add-back of coverage for losses to business personal property—i.e., "Covered Property"—sustained as a result of collapse.

¶ 15. The fact that the phrase "Covered Property" is not explicitly included in subsection A(4), although it is repeated in some other subsections, does not alter our conclusion. As we have observed, "[i]t is not uncommon in insurance agreements for two or more clauses or phrases in different parts of a policy to vary slightly." Waters, 169 Vt. at 537, 725 A.2d at 927. Such variance is not grounds to conclude that Ohio Security intended to provide what amounts to builder's-risk coverage, subject to no applicable coverage limit, within a document styled as a property floater.[2]

---

[2] Although in contract interpretation "the title of an instrument is not necessarily determinative," see Prue v. Royer, 2013 VT 12, ¶ 20, 193 Vt. 267, 67 A.3d 895, it is notable that "[i]n its most common form in modern times, inland marine insurance has become a general floater policy that covers unidentified personal property, or property described only by category, against a variety of risks." 11 Couch on Ins. § 154:64 (3d ed. 2019) (footnotes omitted). In contrast, builder's-risk coverage "is commonly issued to builders to cover the risk of property loss during construction." DeBartolo, 2007 VT 31, ¶ 11. While we give greater weight to the terms of the agreement itself, in some cases, captions aid in " 'ascertain[ing] the meaning and nature' " of the

It is also telling that A(4), providing additional coverage for "loss" involving collapse, is immediately preceded by A(3), which defines "loss" with reference to "Covered Property." There is no other reasonable meaning of "loss" as it is used in A(4) aside from that set forth in A(3)—" 'loss' to Covered Property." Ohio Security was not obligated to separately invoke the "Covered Property" limitation it set forth at the beginning of the "COVERAGE" section in each subsection to communicate that this limitation applied equally thereto, and DeBartolo does not compel a different conclusion.

¶ 16. Far more apposite, we find, is Sanders v. St. Paul Mercury Ins. Co., a case in which we rejected an insured's argument that a policy was ambiguous based on omission of the word "premiums" in one part of the policy where it was included in a parallel provision addressing the same subject matter. 148 Vt. 496, 501, 536 A.2d 914, 917 (1987). There, we held that we could not apply the variance in language to the insured's benefit because the insured had not "provided the predicate for doing so" by "pointing out some reason why [the allegedly ambiguous provision] could not be interpreted definitively without reference to some other contract provision[,]" and we could not perceive one. Id. Further, in Sanders, a reading of the policy as a whole did not detract from the meaning of the challenged provision, which was "clear on its face." Id. Just so here. Taken together, A and A(4) must be interpreted definitively with reference to their own terms.

¶ 17. In short, although the floater would not have suffered from repetition of the term "Covered Property" in subsection A(4), the broader language in section A nonetheless specifically and unambiguously limits A(4)'s grant of coverage to "Covered Property." See Isbrandtsen, 150 Vt. at 580-81, 556 A.2d at 85 (holding that contract which fairly admits of but one interpretation, even where "inartfully worded or clumsily arranged . . . may not be said to be ambiguous or fatally

---

provision at issue. Prue, 2013 VT 12, ¶ 20 (quoting Neece v. A.A.A. Realty Co., 322 S.W.2d 597, 600 (Tex. 1959)). Indeed, this was true in DeBartolo, the case relied on by CCE. DeBartolo, 2007 VT 31, ¶ 12 (looking to general purpose of policy declarations in determining their effect on coverage in policy at issue). This, too, is such a case.

9

unclear"). Certainly, insurers should strive for clarify in drafting policy provisions, consistent with our principles for construing them. Yet, "[p]olicies which specifically and unambiguously exclude coverage are effective to preclude the insurer's liability." Am. Fid. Co. v. Elkins, 125 Vt. 313, 315, 215 A.2d 516, 518 (1965). The additional collapse coverage applied only to "Covered Property," which is business personal property. CCE does not dispute that the barn was not business personal property and thus was not "Covered Property." Therefore, the court's first summary-judgment ruling is reversed.

¶ 18. This holding compels our conclusion on the merits of CCE's appeal from the second summary-judgment motion. Regardless of whether the term "loss," as used in the property floater, encompasses debris removal as CCE asserts, for the reasons set forth above, there is no coverage available under the "Additional Coverage – Collapse" in A(4) of the floater. The debris removal was not a loss involving business personal property. As a result, it was not a loss to "Covered Property"—which we have determined defines the scope of the collapse coverage provided under A(4). On this basis, the second summary-judgment ruling, concluding that there was no coverage for debris removal under the additional collapse coverage provision, is affirmed, albeit on different grounds.[3]

Reversed as to first summary-judgment ruling. Affirmed as to second summary-judgment ruling. Remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____

Associate Justice

---

[3] Because there is no coverage for debris removal for other than "Covered Property" under the collapse coverage in A(4) of the floater, we need not consider the rationale employed by the trial court in granting summary judgment to Ohio Security—that the inclusion of a specific provision regarding debris removal governed over the more general "loss" provision in the collapse coverage.